**AMERICAN MULTI–CINEMA, INC., Plaintiff,**

v.

**SOUTHROADS, L.L.C., Defendant.**

**No. 99–2019–JWL.**

United States District Court,
D. Kansas.

Oct. 17, 2000.

---

John L. Vratil, W. Joseph Hatley, Lathrop & Gage L.C., Overland Park, KS, for Plaintiff.

Charles W. German, Kirk T. May, Rouse, Hendricks, German, May & Shank, Kansas City, MO, for Defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This breach of contract and declaratory judgment action arises out of a retail lease agreement between plaintiff American Multi–Cinema, Inc. ("AMC"), as tenant, and defendant Southroads, L.L.C., as landlord. AMC alleges that Southroads breached the lease, and certain amend-

ments thereto, by failing to deliver timely to AMC physical possession of the leased premises; by failing to complete timely various tasks associated with the shopping center of which AMC was one tenant; and by failing to pay the balance due on a construction allowance payable to AMC under the lease. AMC seeks liquidated damages pursuant to a stipulated damage provision in the lease.[1] Southroads, in turn, alleges that AMC breached the lease by failing to pay rent and other occupancy charges, including real estate taxes and maintenance fees, since early 1998. AMC concedes that it has not paid these amounts, but contends that under the lease it is permitted an immediate offset of rent and other charges against amounts which it claims from Southroads. Both parties have asserted a claim for attorneys' fees under the lease.[2]

A trial to the court was held in this matter from September 5, 2000 through September 8, 2000. The court has thoroughly considered the evidence and arguments presented at trial and is now prepared to issue its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons set forth fully below, the court concludes that AMC is entitled to recover liquidated damages in the amount of $1,624,470.94, including interest, based on Southroads' breach of the Turnover Date clause in the lease. With respect to the Completion Date clause, however, the court concludes that AMC is not entitled to recover the stipulated sum set forth in the lease because the stipulated sum is an unenforceable penalty. The court further concludes that Southroads is entitled to damages on its counterclaim against AMC for unpaid rent and other charges in the

amount of $1,661,168.43, including interest and after offsetting the construction allowance owed to AMC. Finally, the court concludes that both parties are "prevailing parties" as defined by applicable state law and are therefore entitled to recover under the lease's attorneys' fee provision.

## I. Findings of Fact

Plaintiff American–Multi–Cinema, Inc. ("AMC") is a Missouri corporation with its principal place of business in Kansas City, Missouri. Defendant Southroads, L.L.C. ("Southroads") is an Oklahoma limited liability company with its principal place of business in Tulsa, Oklahoma. In December 1995, AMC and Yale 41 Associates Limited Partnership executed a retail lease agreement whereby Yale 41 was the landlord and AMC was a tenant in the Southroads shopping center in Tulsa, Oklahoma. In September 1996, Yale 41's rights and responsibilities under the lease were assigned to defendant Southroads. For purposes of this order, both Yale 41 and Southroads shall be referred to as "Southroads" unless the context requires otherwise.

The lease agreement, including a September 1996 amendment thereto, required Southroads to provide to AMC by November 15, 1996 a pad site with utilities on which AMC would construct a "megaplex" movie theater-the Southroads 20.[3] This November 15, 1996 deadline is referred to in the lease amendment and by the parties as the Turnover Date. The lease agreement and the September 1996 amendment further provided that Southroads was to complete by May 30, 1997 a variety of tasks associated with the Southroads shopping center, including the construction of

1. AMC did not claim any actual damages in the alternative should the court not enforce the stipulated damage provision.

2. In addition, the parties stipulate that Southroads owes AMC $145,227.97, representing the balance due to AMC pursuant to an agreement dealing with certain construction costs. The court has received written correspondence from counsel for AMC indicating that

the court need not concern itself with this amount in resolving the parties' obligations. Counsel for both parties have agreed that this amount will be netted out by the parties once a final judgment is entered.

3. A "megaplex" movie theater is one with more than fourteen screens, stadium seating and multiple concession stands.

all common facilities and access facilities. This May 30, 1997 deadline is referred to in the lease and by the parties as the Completion Date.[4] Of particular relevance to the issues here is the stipulated damage provision found in Article 5 of the lease. Specifically, Article 5 provides that if Southroads breaches the Turnover Date, then AMC is entitled to four days of free rent for each day of delay until Southroads delivers to AMC a properly certified pad site. Article 5 also provides that if Southroads breaches the Completion Date, then AMC is entitled to four days of free rent for each day of delay until Southroads completes each of the completion date tasks set forth in Article 5.

## A. Lease Negotiations and Relevant Provisions

In November 1994, AMC and Southroads began discussing the possibility of constructing a 20–screen movie theater complex (a "megaplex" subsequently referred to as the "Southroads 20") at the Southroads shopping center. The primary negotiators for AMC were Frank Rash, AMC's Vice President of Strategic Development;[5] Pete DiGiovanni, an attorney with Lewis, Rice & Fingersh, a Kansas City law firm; and Sean Ervin, an attorney with the same law firm until April 1995, when Mr. Ervin became an employee of AMC. The principal negotiators on behalf of Southroads were Jim Dill, Chief Executive Officer of Vector Properties, Inc.[6] and President of Yale 41; Clarence "Cricket" Kingham, Executive Vice President of Vector Properties; and Jeff Mawicke, an attorney with a law firm in Milwaukee, Wisconsin.

By the end of 1994, the parties had agreed on the principal business terms of their relationship and had executed a letter of intent-a letter which served as the groundwork for the lease itself. The initial draft of the lease (essentially a form lease used by AMC and retained on the word processing system at Lewis, Rice & Fingersh) was sent by AMC to Yale 41 on January 26, 1995. This draft contained a clause, set forth in Article 5, whereby AMC could terminate the lease in the event that Southroads missed certain deadlines relating to the completion of the construction of AMC's building[7] and other improvements at the shopping center. The initial draft did not include the concept of a number of free days rent for each day of delay.

Mr. Dill objected to the termination clause of Article 5, primarily because of his concern that the clause would affect his ability to obtain financing for the Southroads project. In response to Mr. Dill's request that the parties "soften" the termination clause, AMC introduced the concept of having AMC receive a specific number of days of free rent for each day of Southroads' delay in meeting the completion date items. In that regard, AMC sent to Yale 41 a March 30, 1995 draft of the lease which modified Article 5. Specifically, this draft provided that AMC "shall be entitled to receive ____ days of free Annual Fixed Rent and other charges for each day of delay" beyond the completion date.[8] This draft further provided that if Southroads failed to complete construction of AMC's building and failed to complete other specified improvements at the shopping center

4. As will be explained further below, AMC now concedes that the Completion Date should be moved forward to September 7, 1997.

5. During the lease negotiations, however, Mr. Rash was AMC's Senior Vice President of Real Estate.

6. Vector Properties is a development company focused primarily on retail shopping center development.

7. At the time of this draft, the parties contemplated a "turnkey" transaction whereby Southroads would build the theater and AMC would provide only furniture and equipment. Not until approximately July 1995 did AMC assume responsibility for constructing the theater. Thus, the initial drafts of the lease refer only to completion date items and do not contemplate a "turnover date."

8. The March 30, 1995 draft lease did not contain a specific number of days of free rent.

by an "outside" completion date (*i.e.*, thirty days after the completion date), then AMC would be entitled to terminate the lease. Essentially, then, this draft of the lease replaced AMC's immediate termination right with a stipulated damage provision. Southroads readily agreed to the concept.

Over the next few days, the parties had several discussions as to the exact number of days of free rent that AMC would be entitled to receive in the event of a delay. Towards that end, Mr. Ervin contacted "someone" in AMC's operations department in an effort to get some idea as to the ratio of operating income to rent at AMC's theaters. According to Mr. Ervin, his conversation with the operations person lasted only a few minutes and the person simply "threw out" a ratio of seven to one. Mr. Ervin did not request any documentation or data to 'support this ratio. Armed with this information, AMC ultimately proposed a four to one ratio to Southroads.[9] Believing that a four to one ratio was "fairly stiff," Mr. Dill suggested that a one to one or two to one ratio might be more appropriate. AMC, however, refused to negotiate a ratio lower than four to one and Southroads quickly agreed to it.

No one on behalf of AMC explained to Southroads how or why AMC arrived at the four to one ratio. In addition, the record is devoid of any contemporaneous documents showing what factors, if any, were considered by AMC in selecting the four to one provision. According to Mr. Kingham, the negotiators for AMC simply expressed to Southroads that the "penalty provision had to be significant enough to motivate" Southroads to complete the work on time. Mr. Kingham's testimony on this point is consistent with Mr. Rash's testimony at trial. According to Mr. Rash, the four to one ratio was selected, at least in part, because Southroads was a developer that was "unknown" to AMC and the

four to one provision enabled AMC to "rely" on the completion dates set forth in the lease.

Moreover, although Mr. Rash testified that AMC selected the four to one ratio after assessing the harm that AMC would suffer if Southroads failed to meet its obligations as detailed in Article 5, the court does not find this testimony credible. Mr. Rash, for example, testified that those "risks" included not only the harm that AMC would suffer if it was unable to open its theater on time, but also harm stemming from Southroads' failure to deliver the pad to AMC in a timely fashion and problems associated with mobilizing AMC's construction efforts in connection with the pad turnover. These risks associated with pad turnover, in fact, could not have been considered by AMC at the time the ratio was negotiated because at that time, the parties contemplated that Southroads would build AMC's theater. In other words, the lease-at the time the four to one provision was negotiated-did not include the "pad turnover" concept at all.

In any event, the parties agreed on the four to one provision sometime between March 30, 1995 and April 5, 1995.[10] After that time, the parties never revisited the four to one ratio. The provision appears in all subsequent drafts of the lease, including the final draft executed by the parties. That draft, dated December 22, 1995, incorporates the pad turnover concept, as the parties then contemplated that AMC would build its theater. Pursuant to Article 5 of the final draft of the lease, if Southroads failed to provide to AMC a certified pad site by the November 15, 1996 Turnover Date, [11] then AMC would be entitled to receive an amount equal to four days of free rent for each day of delay between the Turnover Date and the date on which Southroads turned over the pad. Similarly, Article 5 as it appears in the

**9.** It is unclear from the testimony presented whether AMC initially proposed a ratio higher than four to one.

**10.** The four to one provision appears in a April 5, 1995 draft of the lease.

**11.** The final draft of the lease defines the Turnover Date as March 15, 1996. In September 1996, the parties executed an amendment to the lease which established the Turnover Date as November 15, 1996.

final draft of the lease provides that if Southroads failed to complete certain tasks (referred to herein as "completion date items") by the May 30, 1997 Completion Date,[12] then AMC would be entitled to receive an amount equal to four days of free rent for each day of delay between the Completion Date and the date on which the completion date items were completed. Finally, Article 5 permitted AMC to terminate the lease if Southroads failed to meet its Turnover Date obligations by the Outside Turnover Date (*i.e.*, 30 days after the Turnover Date) or if Southroads failed to meet its Completion Date obligations by the Outside Completion Date (*i.e.*, 30 days after the Completion Date).

The completion date items, as set forth in Article 5, included "complete construction" of a parking lot located to the north of the theater (directly in front of the theater); a parking lot located to the southeast of the theater (near the Office Max building as shown on the site plan); and a pedestrian access connecting the southeast parking lot to the front of the theater. Article 5 also required "substantial complete construction" of the center's anchor store buildings; the shopping center's primary entrances; a traffic signal and left-turn lane at the primary entrance to the theater (the South Yale Avenue entrance to the west of the theater); an exit corridor along the southern wall of AMC's building (behind AMC's theater); a new exterior facade along the perimeter of the anchor store buildings such that the shopping center would have a continuous, unbroken facade on all sides; and a "regrading" or leveling out of a high mound of land to the west of the theater (near the theater's primary entrance) to improve the visibility of the theater from South Yale Avenue.

It is undisputed that, in the event of a delay, the four to one provision as set forth in Article 5 applies with full force regardless of whether the theater was open for business or was unable to open for business. Similarly, with respect to the four to one provision as it relates to the Completion Date, it is undisputed that the provision applies with full force regardless of whether Southroads failed to meet all of the completion date items or just one of the completion date items. According to Mr. Rash, AMC simply did not think of selecting a different ratio for a breach of the Turnover Date versus a breach of the Completion Date. Similarly, AMC made no effort to distinguish the nature and extent of harm caused by a breach of just one completion date item from the nature and extent of harm caused by a breach of four, five or all completion date items.

## B. Lease Execution

On December 22, 1995, AMC sent to Southroads (or, more specifically, Mr. Kingham) a copy of the lease as executed by AMC. A transmittal letter accompanied the lease. The letter included the following instructions:

> We are delivering these [lease] documents to you in escrow, and they are not to be released by you from escrow, nor to be considered effective or binding for any purpose, unless and until (i) we provide you with a Title Commitment (which we have approved), and instruct you to attach the same to the Lease as Exhibit E, and (ii) we advise you that we have reached agreement with Guaranty Federal Bank, fsb with respect to the Subordination, Non–Disturbance and Attornment Agreement.

If either of these conditions is not satisfied, we reserve the right to instruct you to immediately return to us all of the enclosed documents, whereupon such documents shall be deemed null and void and of no force or effect.

The letter further requested that Mr. Kingham sign the letter to acknowledge receipt of the lease and acceptance of the additional terms. Mr. Kingham signed the

---

**12.** The final draft of the lease defines the Completion Date as November 15, 1996. The September 1996 amendment to the lease, however, redefined the Completion Date as May 30, 1997.

letter and executed the lease in Tulsa, Oklahoma.

## C. Pad Turnover

In May 1996, AMC advised Southroads that its target date for opening the Southroads 20 theater was July 19, 1997. In June 1996, the parties began negotiating a modification of key dates in the lease, including the Turnover Date. At that time, AMC agreed to a September 1, 1996 Turnover Date. In a June 10, 1996 memorandum, Frank Rash advised Cricket Kingham that "a September 1 pad turnover cuts it very close in hitting our critical July 1997 opening date; October 1 will not make it possible."[13] In September 1996, the parties executed an amendment to the lease which set the Turnover Date as November 15, 1996. At the time of the lease amendment, then, AMC realized that it had virtually no chance of meeting its July 19, 1997 opening date. AMC also recognized that a November 15, 1996 Turnover Date would make it "very difficult" to capture any summer business.[14] In essence, AMC knew in September 1996 that it would be open no later than the holiday season of 1997,[15] with the possibility that the theater would be open in time to hit the "back end" of the summer season.

Southroads concedes that it failed to deliver to AMC a properly certified pad site on November 15, 1996. According to Southroads, however, AMC did not suffer any harm as a result of the Turnover Date breach. Specifically, Southroads maintains that even if the pad site had been turned over in a timely fashion, AMC was not ready to begin construction on the pad site until long after November 15, 1996. In support of this argument, Southroads introduced evidence demonstrating that, as of November 15, 1996, AMC did not have subcontractors for the project, did not have a building permit, did not have finalized construction plans, and did not have a rider agreement with its construction management firm, MBK. Southroads further contends that by the time AMC was ready to begin construction, it was planning on a November 1997 opening.

The court finds that AMC could have started working on the pad site as early as mid-December 1996 if it had been provided a properly certified pad by that time. AMC, through MBK, had selected its subcontractors by Thanksgiving 1996; the evidence at trial demonstrated that MBK could have mobilized construction crews within two to three weeks after the selection of the subcontractors. The construction plans for the theater were substantially complete by October 25, 1996. While Southroads' architect expressed concerns about certain issues in the construction plans, these issues were not of the nature or type that would have delayed construction of the theater had the pad site been ready. Significantly, the only disputed issues regarding the plans focused on which party would assume financial responsibility for relatively minor items (e.g., performing certain curb and gutter work around the theater's sidewalk; installing a trench drain in the exit corridor) rather than on the fundamental design of the theater. According to Doug Seibert, AMC's director of design and development for the Southroads 20, AMC in the past has started construction on theaters before having a final set of construction plans. For these reasons, the court finds that MBK could have started construction of the theater before the plans were finalized.[16] Moreover, the building permit was issued

**13.** The undisputed evidence at trial established that it normally takes nine months to complete the construction of a theater building.

**14.** In AMC's industry, the "summer" season typically extends from Memorial Day weekend through Labor Day weekend.

**15.** The "holiday season" for purposes of AMC's business typically extends from the middle of November through the end of the calendar year.

**16.** In fact, MBK did begin construction of the theater before the plans were finalized. The unresolved issues concerning the construction plans were not resolved until April 29, 1997, when AMC and Southroads executed a letter

on December 19, 1996. Finally, the court finds that AMC and MBK could have executed a partial rider agreement[17] in order to begin construction if the pad site had been turned over on time. In that regard, the evidence demonstrates that execution of the rider agreement was delayed until February 20, 1997 because AMC, after discovering that the bids for the project exceeded the project's budget, decided to "value engineer" the project in an effort to reduce costs. As both Greg Golick (MBK's operations manager) and Chris Sogas (an architect on the Southroads 20 project) testified, however, none of the items that were identified by MBK for potential value engineering would have impeded the start of construction. In addition, the evidence presented at trial indicates that AMC, on other occasions, had executed a partial rider agreement when a project was ready to be started but the final budget was still under review. In other words, there is no reason to believe that AMC and MBK could not have executed a partial rider agreement in November 1997 if the pad site had been ready so that MBK could have started the foundation work for the building.[18] In short, the court finds that AMC could have started work on the pad site by mid-December 1996 if it had been provided a properly certified pad site on November 15, 1996.

The court further finds that AMC, in December 1996, was still anticipating a Summer 1997 opening. In that regard, the court finds the most significant evidence is Trial Exhibit 207–a photograph depicting a large sign erected at the Southroads shopping center advertising the theater's opening in Summer 1997.[19] According to Darrell Kent, MBK's on-site project manager for construction of the Southroads 20, this sign remained in place until at least mid-February 1997. This sign demonstrates that AMC, at least as late as February 1997, still believed that a Summer 1997 opening was possible. There is simply no reasonable business explanation for AMC to advertise to the public a Summer 1997 opening if in fact AMC knew that it would not open until November 1997. At trial, much was made of the fact that AMC was new to the Tulsa market and was concerned about Tulsa's first impression of AMC. It is simply not conceivable that AMC would risk alienating the public by knowingly misrepresenting to the people of Tulsa the anticipated opening of the theater. The only reasonable conclusion is that AMC still hoped for a Summer 1997 opening (albeit late Summer 1997) until Southroads' delays extended through February and into March 1997.[20]

If Southroads had turned over a properly certified pad on November 15, 1996, then AMC, in all likelihood, would have been able to open its theater sometime in August 1997. As it turned out, Southroads did not turn over a properly certified pad until March 11, 1997[21] and AMC was not

---

agreement resolving those issues. AMC, however, had started work on the project on March 12, 1997.

17. AMC and MBK entered a master construction management agreement in 1994 under which MBK was to construct theaters throughout the country. This master contract supplied most of the pertinent terms and conditions of the agreement between AMC and MBK and applied to all projects for which MBK was to provide construction management services. When AMC was ready to begin construction on a particular project, it and MBK executed a "rider" agreement which set forth a schedule and budget for the particular project.

18. According to Doug Seibert, AMC and MBK could have executed a partial rider in about one week's time.

19. In its entirety, the sign read as follows: "AMC 20 Theatres; Coming Summer 1997; AMC Stadium Seating; Changing the Way Tulsa Sees Movies!"

20. This view of the evidence is consistent with Cricket Kingham's testimony on the issue. According to Mr. Kingham, he understood that AMC, in the Fall of 1996, still anticipated a Summer 1997 opening and that it was not until the "early spring" of 1997 that he realized that AMC had changed its target date to November 1997.

21. AMC started working on the pad site on March 12, 1997.

able to open its theater until November 1997. In essence, then, Southroads' breach of the Turnover Date caused AMC to suffer harm in several respects, primarily in the form of lost revenues (*i.e.*, AMC's opening was delayed for several months).[22]

Under the terms of the lease, the principal amount of stipulated damages owing to AMC for Southroads' breach of the Turnover Date is $1,091,877.74. This figure represents 111 days of delay (measured from November 15, 1996 through March 6, 1997 as per Article 5 of the lease) multiplied by AMC's daily rent ($2459.18) multiplied by four (pursuant to the "four days free rent" provision of Article 5).[23] The total amount of stipulated damages that AMC seeks for breach of the Turnover Date, including default interest, is $1,607,-167.30.

*D.  Completion Date*

Pursuant to Article 5 of the lease and the first amendment thereto, Southroads was required to perform certain tasks[24] associated with the shopping center by May 30, 1997–the Completion Date. During closing arguments, counsel for AMC conceded, however, that the Completion Date should be moved forward to September 7, 1997 for purposes of analyzing AMC's claims.[25] In any event, AMC contends that Southroads breached Article 5, as amended, by failing to perform each of the completion date items. Specifically, AMC maintains that Southroads finished

the north parking lot just before the theater opened in November 1997; that the southeast parking lot was still fenced off as late as May 1998; that the pedestrian access was not completed until late June 1998; that the center's primary entrance at 41st street was not open until January 1998; that the regrading work was not done until mid-October 1997; that the traffic signal at the South Yale Avenue entrance was not installed until mid-December 1997; that the exit corridor was never finished by Southroads and that AMC had to complete Southroads' work on the corridor to ensure that the theater could open on time;[26] and that the center itself was generally under "massive construction" until sometime in 1998.

According to AMC, it suffered harm as a result of Southroads' failure to complete the completion date items by September 7, 1997. AMC contends, for example, that Southroads' delays forced AMC to build its theater in the midst of major ongoing construction, thereby increasing AMC's construction costs due to work coordination problems and expedited scheduling. In that regard, Gary Golick testified that the contract between AMC and MBK contemplated approximately $287,000 for project staff, but that AMC, in the end, was charged just over $366,000 for project staff. Similarly, Mr. Golick testified that the contract as drafted contemplated approximately $120,000 for general condi-

---

**22.** AMC's evidence at trial also demonstrated that it suffered harm in the form of additional overhead to MBK (*i.e*, management salaries for MBK's supervisors), and increased construction costs in that AMC was forced to hire additional subcontractors and temporary labor, was forced to pay overtime, and was otherwise forced to accelerate the pace of construction in order to get the theater open prior to Thanksgiving 1997–in time for the holiday "blockbuster" movie business.

**23.** By the court's calculation, the figure is $1,091,875.92. Nonetheless, because Southroads does not dispute AMC's calculation, the court will use AMC's figure.

**24.** These "completion date items" are detailed in part I.A. of this opinion.

**25.** The amendment to the lease contemplates that the Completion Date be 75 days prior to the date when AMC opens its theater. According to AMC's counsel, then, moving the Completion Date to September 7, 1997 (75 days prior to November 21, 1997) upholds the expectations of the parties.

**26.** In order for AMC to use the exit corridor for public traffic, the City of Tulsa had to approve the corridor as a "public way." Until the City approved the corridor, AMC could not obtain a Certificate of Occupancy.

tions, but that AMC was ultimately charged $219,000 for general conditions.

In addition, and perhaps more importantly from AMC's perspective, AMC contends that it lost customers (and, thus, revenues) as a result of Southroads' delays. According to AMC, it lost theater patrons who either had negative experiences at the Southroads 20 in large part because of the unfinished nature of the center or simply did not know that the theater was open based on the appearance of the center (i.e., a construction site). In that regard, Patrick Burns, the theater manager for the Southroads 20 when it first opened, testified that the north parking lot was not large enough to accommodate all of the theater patrons and that a portion of the southeast parking lot was fenced off. As a result of the limited number of parking spaces, patrons were parking their cars in fire lanes and on medians. Patrons were fighting over parking spaces. According to Mr. Burns, he received numerous complaints from customers about the parking situation. To make matters worse, because the primary entrance on 41st street was not open when the theater opened for business, all patron traffic was coming in through the South Yale Avenue entrance-an entrance with no traffic light. Mr. Burns further testified that those patrons who found parking spaces in the southeast parking lot were forced to either walk in the access road or walk down a muddy hillside to get to the theater. According to Mr. Burns, approximately 95 percent of all customer complaints that he received had to do with pedestrian access from the southeast parking lot to the theater. Customers complained of slipping in the mud and soiling or tearing their clothes. Mr. Burns witnessed cars swerving to avoid striking patrons who were walking in the road and saw theater patrons splashed with dirty water from cars running over potholes in the road. In essence, AMC contends that a vast number of the theater's first-time patrons were not impressed and, in all likelihood, did not return.

Consistent with AMC's theory that the conditions at the shopping center left patrons with a negative impression of AMC, AMC presented evidence at trial demonstrating that the performance of the Southroads 20 has declined over time. During the first four and one-half months it was open, the Southroads 20 theater generated $14,093 in operating income per day. The theater was ranked fourth in Operating Cash Flow Before Rent per Screen among the 27 AMC megaplexes open during the period from November 21, 1997 through July 30, 1998. After the theater had been open for several months, the performance of the Southroads 20 declined to the point that, in fiscal year 1999,[27] it ranked 11th (measured in Operating Cash Flow Before Rent per Screen) out of those same 27 theaters. For calendar year 1999, the theater ranked 17th out of those same theaters. While AMC concedes that much of this decline in performance can be attributed to competition in the Tulsa market,[28] it maintains that the competition looked considerably more attractive to movie-goers in light of their negative experiences at the Southroads 20 and the conditions at the shopping center.

AMC seeks stipulated damages in the principal amount of $3,216,612.81 for Southroads' breach of the Completion Date. This figure represents 327 days of delay (measured from the revised Completion Date of September 7, 1997 through July 31, 1998–the date on which AMC alleges that Southroads finally completed the tasks set forth in Article 5) multiplied by AMC's daily rent ($2459.18) multiplied by four (pursuant to the "four days free rent" provision of Article 5).[29] The total

---

27. AMC's fiscal year ends March 31 or the first Friday thereafter.

28. At the time the Southroads 20 opened, it was the only megaplex in the Tulsa area and the first AMC theater in Tulsa. Over Memorial Day weekend of 1998, a competitor of AMC opened a megaplex across the street from the Southroads 20. Other megaplexes opened throughout Tulsa shortly thereafter.

29. According to the court's calculations, the figure is $3,216,607.44. Because Southroads

amount of stipulated damages that AMC seeks for breach of the Completion Date, including default interest, is $4,298,494.28.

In response to AMC's evidence, Southroads presented evidence at trial showing that any actual harm suffered by AMC in the form of lost goodwill is negligible at best and that any significant shortfall in revenue experienced by AMC was simply not caused by Southroads' breach of the Completion Date. The court finds the evidence in this regard particularly persuasive. Simply put, the performance of the Southroads 20 was better than anyone at AMC ever expected.[30] AMC created a number of "deal sheets" prior to the time the theater opened. The first deal sheet, created in December 1994, projected annual operating income at the Southroads 20 of $1,531,000.[31] In September 1995, AMC prepared a revised deal sheet projecting annual operating income of $1,462,000.[32] December 1995, AMC prepared a deal sheet projecting annual operating income of $1,804,000.[33] For fiscal year 1998, AMC projected annual operating income of $801,449. In fact, AMC earned $1,684,281 in operating income for that period. For fiscal year 1999, AMC projected annual operating income of $920,661. AMC earned $3,044,724 in operating income for that period. Similarly, the attendance figures for the Southroads 20 far exceeded AMC's projections. For fiscal year 1998, AMC projected attendance at the Southroads 20 of 519,000 persons. Actual attendance for that fiscal year was 742,051. For fiscal year 1999, AMC projected attendance of 1,050,000 and even factored upcoming competition into that projection. Actual attendance for fiscal year 1999 was approximately 1,400,000.

In any event, an appreciable loss of goodwill by AMC cannot reasonably be attributed to Southroads' breach of the Completion Date. It is undisputed that AMC's parking lot, the lot to the north of the theater, was completed by November 21, 1997–the date on which AMC opened its doors. Similarly, the left-turn lane and entrance into AMC's parking lot from South Yale Avenue were complete by opening day. While the traffic signal was not yet installed, Mr. Hayes' undisputed testimony at trial established that Southroads hired security personnel to direct traffic at that entrance during peak hours between November 21, 1997 and December 18, 1997–the date on which the signal was installed. The exit corridor and re-grading work were finished by November 21, 1997. Many of the stores in the Southroads shopping center were complete and open for business prior to the time AMC opened for business.[34]. With respect to the pedestrian access, there was simply no evidence presented at trial that AMC, in negotiating or executing the lease with Southroads, bargained for anything other than what was provided by November 1997–a sort of "walkway" that contemplated that pedestrian traffic would walk along the roadway and across vehicle traffic two times between the parking lot and the theater. *See* Ex. 660 (site plan of premises). While AMC complains that a sidewalk was not poured on the hillside until June 1998, and that sod was not put down

---

has not objected to AMC's calculations, however, the court will use AMC's figure.

30. Mr. Burns testified that the theater performed "very well" when it opened and that it "exceeded" his expectations.

31. This deal sheet also projected an average annual base rent of $973,000 over the life of the lease. In other words, the deal sheet showed an operating income to rent ratio of less than two to one.

32. This deal sheet projected an average annual base rent of $976,000 over the life of the lease, or an operating income to rent ratio of less than two to one.

33. This deal sheet projected an average annual base rent of $949,000 over the life of the lease and, thus, an operating income to rent ratio of just under two to one.

34. These stores include Bank One; Pearle Vision; Just for Feet; Old Navy; Paper Warehouse; Oshman's Sporting Goods; S & K Famous Brands Menswear; and Barnes & Noble Bookseller.

until sometime in May 1998, there was no evidence presented that AMC bargained for a sidewalk or for a suitable use as a pathway over the mound located between the southeast parking lot and the theater. While Southroads eventually added a sidewalk, cross-hatching on the "walkway" where the original pedestrian access was designated, and a stairway on the terrain between the parking lot and the theater, AMC simply has not presented evidence that they were entitled to any of these conditions pursuant to the lease. In essence, then, the vast majority of customer complaints received by AMC (i.e., 95 percent of all customer complaints) stemmed from the pedestrian access-an access that, while perhaps inadequate in hindsight, nonetheless fulfilled Southroads' obligations under the lease.

In sum, the court finds that while Southroads did not complete each and every completion date item by the Completion Date, any harm that AMC might have suffered in the form of lost goodwill caused by any breach on the part of Southroads which translated into lost business for AMC is negligible at best.

## E. Construction Allowance

The parties have stipulated to the facts pertinent to AMC's contention that Southroads breached the lease by failing to pay the balance due on the construction allowance. Those facts are as follows. The as-built floor area of AMC's building is 74,182 square feet. The total construction allowance payable to AMC is $6,157,106.00 ($83.00 × 74,182 square feet). As of December 20, 1997, $4,855,820.00 of the construction allowance had been paid by Southroads to AMC. On January 9, 1998,

an installment of the construction allowance in the amount of $685,575.40 was due to AMC. Five hundred thousand dollars of that amount was paid to AMC on February 24, 1998. In addition, Southroads was entitled to withhold payment of 10% of the construction allowance, or $615,710.60, until twenty days after AMC completed its construction and provided Southroads with a final lien waiver. AMC forwarded the final lien waiver to Southroads on December 22, 1998. As of this date, the principal balance of the construction allowance which has not been paid is $801,286.00. The total amount that AMC seeks in connection with the construction allowance, including default interest, is $996,838.09.[35]

## F. Southroads' Counterclaim

According to Southroads, AMC has not paid rent and other charges due Southroads in the principal amount of $2,504,264.72. This amount includes 1999 real estate taxes on the parcel upon which AMC's theater sits in the amount of $80,702.93 and also includes 1998 real estate taxes in the amount of $42,224.87. AMC contests Southroads' calculations only to the extent Southroads seeks to recover the amount reflecting 1998 real estate taxes.

According to AMC's evidence, the lease required Southroads to provide to AMC by June 29, 1999 documentation reflecting Southroads' payment of the 1998 real estate taxes and a computation of AMC's liability for its share of the real estate taxes attributable to the shopping center. The lease expressly provides that if Southroads misses that deadline, AMC is excused from paying real estate taxes for that particular year.[36] Garry Hayes, the

35. As set forth in the pretrial order, AMC's contention that Southroads breached the lease by failing to pay when due the remaining balance of the construction allowance is actually a defense to Southroads' counterclaim and not an independent basis on which AMC seeks to recover damages. In other words, AMC is not entitled to a money judgment in its favor for the balance, but rather may offset the balance against Southroads' counterclaim for unpaid rent.

36. Specifically, the lease provides, in pertinent part, as follows:

If Tenant's Tax Parcel is not separately assessed, then Landlord shall, at least 45 days prior to the date on which such Taxes are due, mail to Tenant (i) evidence of Landlord's payment of the Taxes for the preceding Fiscal Tax Year, and (ii) a computation of the Taxes Applicable to the Leased Premises for the current Fiscal Tax Year, and certify in writing to Tenant the accuracy

property manager at the Southroads shopping center, testified at trial that he did not provide AMC with the requisite certification regarding the 1998 real estate taxes. Although Mr. Hayes "assumes" that the proper documentation was sent to AMC, he conceded that Southroads had no evidence to suggest that the documentation was in fact sent to AMC. Indeed, Southroads offered no evidence that the documentation was sent to AMC as required by the lease.

## G. Legal Expenses

Both AMC and Southroads have asserted a claim for attorneys' fees pursuant to Article 37(B) of the lease. That provision states as follows: "In case suit shall be brought because of the breach of any agreement or obligation contained in this Lease on the part of Tenant or Landlord to be kept or performed, and a breach shall be established, the prevailing party shall be entitled to recover all expenses incurred in connection with such suit, including reasonable attorneys' fees."

## II. Conclusions of Law

■ The threshold issue the court must resolve is which state's law to apply. In determining the applicable law, a federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Bancoklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir.1999). Kansas courts apply the doctrine of lex loci contractus, which requires that the court interpret the contract according to the law of the state in which

thereof, which computation and certification shall be accompanied by all information supporting such computation ... and within 30 days after receipt thereof by Tenant ... Tenant shall pay Landlord the amount of the Taxes Applicable to the Leased Premises. If Landlord fails to deliver such computation, certification and information to Tenant within 180 days after the end of a Fiscal Tax Year, Tenant shall have no obligation to pay Taxes Applicable

the parties performed the last act necessary to form the contract. *See Missouri Pac. R.R. Co. v. Kansas Gas and Elec. Co.*, 862 F.2d 796, 798 n. 1 (10th Cir.1988) (citing *Simms v. Metropolitan Life Ins. Co.*, 9 Kan.App.2d 640, 642–43, 685 P.2d 321 (1984)).

■ The parties disagree with respect to where the last act necessary to form the contract occurred. According to AMC, when Cricket Kingham signed the transmittal letter in Tulsa, he agreed that the lease would not be formed until the two "precontractual events" described in the transmittal letter occurred (*i.e.*, AMC obtained a title commitment and Subordination, Non–Disturbance and Attornment Agreement with its lender). AMC further argues, then, that the contract was not formed until AMC's attorney sent to Southroads a copy of the title commitment and advised Southroads that an agreement had been reached with AMC's lender. Thus, AMC maintains that the last act necessary to contract formation occurred in Kansas City, Missouri, the place from which AMC's attorney sent the title commitment and instructed Southroads that an agreement with its lender had been reached. Based on this interpretation of the evidence, AMC urges the court to apply Missouri law to the facts of the case.[37] Southroads, on the other hand, argues that the transmittal letter sent to Cricket Kingham constituted a counteroffer by AMC-the letter proposed certain modifications to the contract-and that Mr. Kingham accepted the counteroffer by signing the transmittal letter. Thus, Southroads contends that the contract was formed in Tulsa at the time Mr. Kingham signed the trans-

to the Leased Premises for such Fiscal Tax Year.
*See* section 2(B), Rent and Expense Rider (attached to and forming a part of the lease).

**37.** Under Missouri law, the burden is apparently on Southroads, as the party challenging the stipulated damage provision, to prove that the provision is a penalty. *See, e.g., Manufacturers Casualty Ins. Co. v. Sho–Me Power Corp.*, 157 F.Supp. 681, 684 (W.D.Mo.1957).

mittal letter. According to Southroads, the conditions described in the letter regarding title commitment and the SNDA agreement were simply events that had to occur before performance under the contract would become due rather than events that had to occur before the contract would be formed. Southroads maintains that the court must apply Oklahoma law to the facts of the case.[38]

■ After carefully considering the evidence on this point, the court concludes that the last act necessary to formation of the contract ·occurred in Oklahoma-the place where Cricket Kingham signed the transmittal letter. In essence, the letter sent by AMC, which proposed certain modifications or new terms to the contract, was a counteroffer. Mr. Kingham accepted that counteroffer when he signed the transmittal letter and a contract was formed at that time. The new terms set forth in the transmittal letter were simply conditions that had to occur before performance under the contract became due. See E. Allan Farnsworth, Contracts § 8.2 (2d ed.1990) (citing Restatement (Second) of Contracts § 224). The terms were not "precontractual events" that had to occur before the contract was formed. Because AMC's counteroffer was accepted in Tulsa, Oklahoma, the contract was formed at that time and the court will apply Oklahoma law to the facts of the case.[39]

■ Oklahoma regulates by statute the enforceability of a provision for stipulated damages. See Okla. Stat. Ann tit. 15, §§ 213–215 (West 1993). Under that statutory scheme, a contractual provision for stipulated damages "shall be held valid, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damages." See Okla. Stat. Ann. tit. 15, § 215(A). If the stipulated sum, however, imposes a penalty, then the provision will be deemed void even if the damage resulting from a breach would be difficult to ascertain. See Sun Ridge Investors, Ltd. v. Parker, 956 P.2d 876, 877 (Okla.1998); Waggoner v. Johnston, 408 P.2d 761, 768–69 (Okla.1965) (language of Okla. Stat. Ann. tit. 15, § 215(A) must be construed in conjunction with the language of two preceding sections). The burden of establishing that damages would be difficult to ascertain and that the provision does not impose a penalty rests on the party seeking to enforce the stipulated damage provision. See Fretwell v. Protection Alarm Co., 764 P.2d 149, 152 n. 3 (Okla.1988) (citing Massey v. Love, 478 P.2d 948 (Okla.1970)); Waggoner, 408 P.2d at 768–69. Nonetheless, Oklahoma courts favor enforcement of contractual forfeiture provisions where damages are difficult to determine. See Waggoner, 408 P.2d at 770 ("[T]his court favors the interpretation of a forfeiture provision in a contract, where damages are difficult to determine, to be one for liquidated damages and not a penalty."); accord Farnsworth, supra, § 12.18 ("[T]he trend has been to favor freedom of contract by enforcing [stipulated damage] clauses as long as they do not clearly disregard the principle of compensation").

■ The Supreme Court of Oklahoma has identified three criteria by which a valid liquidated damages provision may be

---

**38.** Unlike Missouri law, Oklahoma law places the burden on the party seeking enforcement of the stipulated damage provision to establish that the provision does not impose a penalty. See Waggoner v. Johnston, 408 P.2d 761, 769 (Okla.1965). While AMC contends in its trial brief that Waggoner does not speak to the issue of which party bears the burden of proof on the issue of whether a stipulated damage provision amounts to a penalty, the court disagrees. The Waggoner court clearly and unequivocally places the burden on the party seeking to enforce the stipulated damage provision to show that the provision does not impose a penalty. See id. ("To sustain a provision on the ground that it provides for liquidated damages, the evidence must be sufficient to show first, that it would be impracticable or extremely difficult to fix the actual damage and second, that the provision does not impose a penalty.").

**39.** This conclusion does not have a determinative effect on the outcome of this case. The court would reach the same ultimate conclusions in this case were it to apply Missouri law. See infra notes 44 and 54.

distinguished from a penalty: (1) the injury caused by the breach must be difficult or impossible to estimate accurately; (2) the parties must intend to provide for damages rather than for a penalty; and (3) the sum stipulated must be a reasonable pre-breach estimate of the probable loss or reasonably proportionate to the actual damage sustained at the time of the breach. *See Sun Ridge Investors,* 956 P.2d at 878; *Waggoner,* 408 P.2d at 769. In essence, liquidated damages are permitted where the actual damages are by their nature uncertain and where they are not clearly disproportionate to probable actual harm. *See B & B Lines, Inc. v. Ryan Freight Lines, Inc.,* 601 P.2d 1207, 1209 (Okla.App.1979).

■ Before turning to the merits of AMC's claim for liquidated damages, the court takes a closer look at the specific stipulated damage provision set forth in Article 5 of the parties' lease. As set forth above, the four to one ratio applies to the Turnover Date clause as well as to the Completion Date clause. In other words, Article 5 contains one stipulated damage provision that applies in the event of a breach of either or both of two distinct clauses.[40] The issue, then, is whether a conclusion that the stipulated damage provision is an unenforceable penalty with respect to one clause mandates the conclusion that the stipulated damage provision is an unenforceable penalty as to the other

clause. Stated another way, can the stipulated damage provision be liquidated damages with respect to one clause and an unenforceable penalty with respect to the other?

The court has not uncovered and the parties have not referenced any Oklahoma authorities addressing this specific issue. The court looks first, then, to other jurisdictions for guidance. In that regard, the court has uncovered only a handful of cases directly on point. Those cases stand for the following general proposition:

> [W]here a contract contains several covenants, and the stipulated forfeiture is applicable alike to each covenant, and would become due upon the breach of a single covenant, and is clearly a penalty as to one covenant, it will be held a penalty as to all covenants.

*See Miller v. Blockberger,* 111 Ohio St. 798, 146 N.E. 206, 209 (1924); *accord Lansing v. Dodd,* 45 N.J.L. 525, 1883 WL 8132, at *3 (1883) ("The sum named must be regarded as liquidated as to all the provisions to which it shall extend, or it will not be so regarded as to any. It cannot be liquidated damages in one case and not in the other.").[41] In the end, however, the rule stated in these cases is of little comfort to the court. The cases are antiquated and, thus, the results reached may simply reflect the "historical hostility toward attempts to stipulate damages" rather

---

**40.** The parties' decision to use the same ratio for both clauses was not an arbitrary one. As explained below in part II.A. of this opinion, the two clauses share a common denominator in that a breach of either clause could well result in the same harm to AMC-the inability to open the Southroads 20 as scheduled. In fact, AMC's inability to open its theater would be the principal harm resulting from a breach of the Turnover Date clause. Similarly, with respect to the Completion Date clause, a material breach of some of the individual covenants within that clause would likely bear on AMC's ability to open its theater (*e.g.,* completion of AMC's north parking lot). The problem with the stipulated damage provision as it relates to the Completion Date clause, however, is that the vast majority of the completion date items would not necessarily affect AMC's

ability to open the Southroads 20. In fact, AMC was able to open its theater despite the fact that Southroads had failed to complete many of the completion date items in a timely fashion. Thus, Article 5 as drafted would permit AMC to recover stipulated damages for the same period of time in which it was earning revenues-revenues that were much higher than ever anticipated. For these reasons, as will be further explained below, the stipulated sum with respect to the Completion Date clause is an unenforceable penalty despite the fact that a breach of both clauses potentially posed the same risk to AMC.

**41.** Neither AMC nor Southroads has cited these cases in their papers. In fact, the parties apparently were unable to find any cases directly on point.

than a meaningful effort to assess the reasonableness of the particular stipulated damage provision. *See* Farnsworth, *supra*, § 12.18, at 941. The *Lansing* court, in fact, noted that any doubts with respect to whether a stipulated damage provision is reasonable should be resolved in favor of unenforceability and that the "tendency and preference of the law" is to construe such provisions as penalties. *See Lansing*, 45 N.J.L. 525, 1883 WL 8132, at *4.

The modern trend, however, is toward increasing recognition of stipulated damage provisions. *See* Farnsworth, *supra*, § 12.18, at 943; *accord Waggoner v. Johnston*, 408 P.2d 761, 770 (Okla.1965) ("[C]ourts are beginning to look with favor upon stipulated damage provisions."). Consistent with that trend, scholarly writers have urged a rule under which a stipulated damage provision that is unenforceable as to one covenant would nonetheless be enforceable as to another covenant so long as that covenant is a reasonable forecast in the light of the breach that actually occurred. *See* Farnsworth, *supra*, § 12.18, at 943. Corbin, for example, has made the following observation:

A case may, indeed, arise in which the amount specified in the contract is a reasonable forecast and estimate of the injury caused by the breach that has actually occurred, even though it would not be so in the case of other breaches that might have occurred. If the contract provision has this actual operation in the case before the court, and the extent of injury is difficult of estimation, there is nothing to prevent the enforcement of the express provision.

5 Arthur Linton Corbin, *Corbin on Contracts*, at § 1066 (1964). The Restatement (Second) of Contracts is in accord. Section 356 of the Second Restatement addresses liquidated damages and penalties. The comment to that section provides, in relevant part, as follows:

The parties to a contract may effectively provide in advance the damages that are to be payable in the event of breach as long as the provision does not disregard the principle of compensation....

However, the parties to a contract are not free to provide a penalty for its breach. The central objective behind the system of contract remedies is compensatory, not punitive. Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy. *The rest of the agreement remains enforceable, however, under the rule stated in § 184(1)* ....

*Restatement (Second) of Contracts* § 356 cmt. (1981) (emphasis added) (citation omitted). Section 184(1), in turn, provides that "[i]f less than all of an agreement is unenforceable ... a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange." *See id.* § 184(1). As explained in the comment to that section, "[w]hether the performance is an essential part of the agreed exchange depends on its relative importance in the light of the entire agreement between the parties." *See id.* § 184(1) cmt.

Bearing in mind the principles articulated by these more recent authorities, the court turns back to the law of Oklahoma for some sense of what Oklahoma courts might decide if faced with this issue today. For as Judge Posner of the Seventh Circuit emphasized in analyzing whether a clause was for a penalty or for liquidated damages:

[W]e must be on guard to avoid importing our own ideas of sound public policy into an area where our proper judicial role is more than usually deferential. The responsibility for making innovations in the common law of Illinois rests with the courts of Illinois, and not with the federal courts in Illinois.

*See Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1289 (7th Cir.1985) (citation omitted). The Oklahoma Supreme Court

"favors the interpretation of a forfeiture provision in a contract, where damages are difficult to determine, to be one for liquidated damages and not a penalty." *See Waggoner v. Johnston*, 408 P.2d 761, 770 (Okla.1965). That court has also "adopted language from decisions of the Supreme Court of the United States to the effect that courts are beginning to. look with favor upon stipulated damage provisions between parties who have equality of opportunity for understanding and insisting upon their rights." *See id.*

Mindful that the Supreme Court of Oklahoma favors classification as liquidated damages where there exists equality of bargaining power between sophisticated parties, the court concludes that the proper approach here is to reject a rule that would require this court to construe the stipulated damage provision of Article 5 as a penalty as to one clause (*i.e.*, the Turnover Date) simply because the court concludes that the provision is a penalty as to the other clause (*i.e.*, the Completion Date). In this case, the parties were on equal footing-all were experienced, sophisticated business people and all were represented by counsel throughout the lease negotiations. Moreover, as will be set forth in more detail below, the stipulated damage provision as it relates to the Turnover Date was a reasonable forecast and estimate of the injury caused by the breach that actually occurred. In addition, the extent of the injury caused by South-roads' breach of the Turnover Date is difficult of estimation. Finally, enforcing the stipulated damage provision in favor of AMC as it relates to the Turnover Date comports with the guideline suggested by the Second Restatement in that AMC did not engage in "serious misconduct" and because the stipulated damage provision as it relates to the Completion Date is not an essential part of the agreed exchange.[42] In light of all of these circumstances, there is no sound reason not to enforce the stipulated damage provision with respect

to the Turnover Date even though the stipulated sum is an unenforceable penalty with respect to the Completion Date.

With this framework in mind, the court turns to the merits of AMC's claim.

As set forth in more detail below, the court concludes with respect to the Turnover Date that AMC has met its burden of showing that, at the time of contracting, it was impracticable to fix the actual damage that AMC would sustain as a result of Southroads' breach of the Turnover Date and that the stipulated sum for that breach does not impose a penalty. With respect to the Completion Date, however, the court concludes that AMC has failed to meet its burden of proving that the stipulated sum does not impose a penalty. The court further concludes that Southroads is entitled to damages on its counterclaim for unpaid rent and other charges. Finally, the court concludes that both parties are "prevailing parties" entitled to recover under the attorneys' fees provision set forth in the lease.

*A. The Parties' Intent*

■ In an effort to ascertain the parties' intent in drafting the stipulated damage provision, the court looks to the evidence concerning the parties' negotiation of the four to one ratio. Based on the specific factual findings set forth above, the court concludes that AMC, at the time of contracting, made no effort to forecast the damages it would suffer in connection with mobilizing construction, lost goodwill, or any of the particular completion date items. Stated another way, AMC did not intend for the four to one ratio to compensate AMC for the damages it would suffer for increased construction costs, lost goodwill, or the individual completion date items set forth in Article 5. That is not to say, however, that AMC totally disregarded the principle of compensation when it proposed the four to one provision. In

42. The essential part of the contract between the parties is AMC's agreement to pay rent to Southroads in exchange for Southroads' agreement to lease the premises to AMC for the Southroads 20.

fact, the court concludes that AMC did intend for the stipulated damage provision to compensate AMC for damages it would sustain as a result of Southroads' breach of its Article 5 obligations, but only to the extent that breach actually delayed the opening of the Southroads 20. For it is beyond dispute that AMC's primary, if only, concern when negotiating the stipulated damage provision was that its theater be able to open as scheduled. The court concludes, then, that AMC, in negotiating the stipulated damage provision, intended that the stipulated sum would compensate AMC to the extent AMC was unable to open its theater as a result of Southroads' delay. Moreover, AMC's inability to open its theater as scheduled would be the principal harm resulting from Southroads' breach of the Turnover Date clause. Thus, AMC intended the stipulated sum to provide for damages, at least with respect to the Turnover Date clause.[43]

■ By the same reasoning, AMC also considered the principle of compensation with respect to the Completion Date clause to the extent a breach of that clause delayed the opening of the Southroads 20. The problem, however, is that the stipulated damage provision applies with full force for any breach of any of the individual covenants within the Completion Date clause and that a breach of most of those individual covenants would have no bearing on AMC's ability to open its theater.

For this reason, the stipulated damage provision as it relates to the Completion Date clause functions as a penalty and is invalid. As the Supreme Court of Oklahoma has recognized:

> Whether an agreement provides for the performance or non-performance of one single act, or of several distinct and separate acts, if the stipulation to pay a certain sum of money upon a default is so framed, is of such a nature and effect that it necessarily renders the defaulting party liable in the same amount at all events, both when his failure to perform is complete, and when it is only partial, the sum must be regarded as a penalty, and not as liquidated damages.

*See Mattes v. Baird,* 176 Okla. 282, 55 P.2d 48, 52 (1935); *accord Graves v. Fitzpatrick,* 127 Okla. 124, 260 P. 10, 11 (1927) ("Where a contract provides for a number of distinct things to be done by one of the parties, and further provides a sum certain to be taken as liquidated damages, if there is only a partial breach, the sum agreed upon as liquidated must be held a 'penalty,' and the plaintiff can only recover his actual damages.") (quoting *City Nat. Bank v. Kelly,* 51 Okla. 445, 151 P. 1172, 1175 (1915)).[44] As more fully explained by Corbin:

> Contracts are frequently made in which performances of very different degrees of importance and value are promised and one sum of money is made payable as damages for any breach whatever.

---

**43.** The actual Turnover Date concept, of course, did not exist at the time the parties negotiated the stipulated damage provision. Nonetheless, AMC's concern that it be able to open its theater as scheduled was the primary factor in negotiating the provision and that concern certainly carried over to the Turnover Date once that concept was established.

**44.** The result would be the same under Missouri law. *See Wilt v. Waterfield,* 273 S.W.2d 290, 295 (Mo.1954) ("To arrive at the intent of the parties, a court may consider whether the agreement contains various stipulations of various degrees of importance, the breaches of which would be easy to calculate in damages as to some and difficult as to others, in which event the sum specified would be con-

strued as a penalty and not as liquidated damages."); *accord Knaus v. Lindsey,* 222 Mo.App. 476, 280 S.W. 713, 716 (Mo.Ct.App. 1926). Although AMC contends that *Taos Construction Co. v. Penzel Construction Co.,* 750 S.W.2d 522 (Mo.Ct.App.1988), supports a contrary conclusion, the facts of *Taos Construction* are easily distinguished from the facts here. Significantly, *Taos Construction* involved a public works project, not a private owner. *See id.* at 526. In reaching its decision, then, the Missouri Court of Appeals relied in large part on Missouri cases recognizing that "in a public works project, the public entity may recover liquidated damages solely upon proof of a violation of the contract." *See id.* at 526–27.

Since such a contract promises the same reparation for the breach of a trivial or comparatively unimportant provision as for the breach of the most important one or of the whole contract, it is obvious that the parties have not made a reasonable forecast of just compensation for each of these varying breaches. The amount made payable is the same without regard to the extent of injury done by the various breaches; such a penalty is not enforceable.

\* \* \* \*

Not only may a named sum be a penalty for the reason that there were several diverse promises, it may also be such for the reason that it is made payable for any breach of a single promise without regard to whether the breach is partial or total. There may be different degrees of non-performance; and it may be evident that these will cause injury in varying amounts. If it is apparent from the beginning that the injury may be thus variable in character and may be much less or much more than the stipulated sum, it is not a genuine pre-estimate of loss. It is otherwise in case the damages are made to vary in amount as the extent of the non-performance varies.

5 Arthur Linton Corbin, *Corbin on Contracts* § 1066 (1964) (footnotes omitted).

Pursuant to Article 5, AMC is entitled to four days of free rent for each day of delay with respect to the Completion Date regardless of whether all completion date items remain unfinished or only a single completion date item remains unfinished. In other words, Southroads would be liable to AMC for the same amount of damages regardless of whether it was delayed in completing AMC's parking lot; delayed in completing the facade on the south side of the shopping center; delayed in completing the regrading work; delayed in completing a left-turn lane into the center; or delayed in all of these things. As Mr. Rash admitted during his trial testimony, however, the impact on AMC of Southroads' failure to complete the items in Article 5 would vary depending on the number and type of items that Southroads failed to complete. According to Mr. Rash, if Southroads, for example, had failed to complete AMC's north parking lot by the Completion Date, then AMC would not have been able to open its theater as scheduled. By contrast, Southroads' failure to complete a portion of the facade on the south side of the center would not bear on AMC's ability to open its theater and, thus, would have a much lesser impact on AMC.

This evidence, then, clearly supports the conclusion that the stipulated damage provision, at least with respect to the Completion Date, is a penalty.[45] The fact that the four to one provision applies with full force regardless of whether the theater was able to open for business or unable to open for business and regardless of whether Southroads failed to meet all of the completion date items or any one of the completion date items demonstrates that the parties, when drafting the stipulated damage provision, made no effort to forecast AMC's loss with respect to the Completion Date. Indeed, Mr. Rash testified that AMC made no effort to distinguish the nature and extent of harm caused by a breach of just one completion date item from the nature and extent of harm caused by a breach of four, five or all completion date items. Under the Oklahoma authorities set forth above, then, the stipulated damage provision as it relates to the Completion Date is a penalty.[46]

---

45. The undisputed evidence at trial also demonstrates that the primary negotiators of the stipulated damage provision, Mssrs. Dill and Rash, consistently characterized the provision as a "penalty" provision. While this evidence is far from conclusive and, standing alone, would be of little significance, *see Fretwell v. Protection Alarm Co.,* 764 P.2d 149, 152 (Okla.1988) (the name given to the provision by the parties "is but of slight weight"), it does support the court's conclusion, based on other evidence, that the provision, at least with respect to the Completion Date, is an unenforceable penalty.

46. The general rule that a stipulated damage provision must be regarded as a penalty when it provides the same reparation for the breach

*B. Whether Ascertaining Damages at Time of Contracting Was Impracticable or Extremely Difficult*

▮ AMC maintains that, at the time of contracting, it was extremely difficult to ascertain the damages that AMC was likely to incur if Southroads breached the Turnover Date or the Completion Date. *See Waggoner v. Johnston,* 408 P.2d 761, 769 (Okla.1965) (whether damages are difficult of ascertainment is to be determined "as of the time the contract was entered into and not at the time of the breach") (citing *Knapp v. Ottinger,* 206 Okla. 113, 240 P.2d 1083, 1087 (1951)). The evidence supports this conclusion.

With respect to the Turnover Date, it is undisputed that the damages that AMC would suffer as a result of Southroads' failure to deliver the pad site in a timely fashion would be in the form of lost income, assuming AMC was delayed in opening its theater. At the time of contracting, however, ascertaining the amount of income that AMC might lose as a result of a Turnover Date breach was impracticable. The evidence presented by AMC at trial demonstrates that megaplexes were an entirely new concept at the time the parties executed the lease agreement in December 1995. In fact, AMC's first megaplex, located in Dallas, Texas, had opened only six months earlier. Mr. Rash also testified that AMC, prior to opening the Southroads 20, had never before owned or operated a theater in the Tulsa market. According to Mr. Rash, these circumstances made it challenging for AMC to predict what level of income the Southroads 20 might generate. While Mr. Rash conceded that attendance patterns and financial figures related to AMC's smaller theaters were certainly a starting point in generating projections for the Southroads 20, it was undisputed at trial that these figures would not accurately reflect the earning potential of a megaplex theater-a theater that was expected to draw larger audiences from a larger geographical area. The difficulties AMC faced in estimating the profitability of the Southroads 20 are further reflected in the numerous and varying deal sheets that AMC generated prior to opening the Southroads 20.[47] In short, AMC has met its burden of showing that, at the time of contracting, the damages that AMC would suffer as a result of Southroads' failure to meet its Turnover Date obligations were difficult to ascertain.

With respect to the Completion Date, AMC contends that, at the time of contracting, it reasonably believed that a breach of the Completion Date could result in lost income to AMC (to the extent AMC was unable to open its theater as scheduled); lost goodwill (to the extent customers might be dissuaded from attending movies at the Southroads 20 if the rest of the shopping center was a construction zone); and/or increased construction costs (for problems relating to work coordination). AMC further contends that the amount of these damages were extremely difficult to ascertain at the time of contracting. As set forth above with respect to the Turnover Date, the evidence presented at trial supports AMC's argument that its potential lost income from a breach of the Completion Date was difficult to ascertain at the time of contracting. The

---

of a trivial provision as it does for the breach of the most important provision or of the whole contract is not without exceptions. The rule would not apply, for example, if the several separate provisions related to events that constituted successive steps leading up to the contract's primary purpose. *See, e.g., Mattes v. Baird,* 176 Okla. 282, 55 P.2d 48, 52–53 (Okla.1935). The rule would also not apply if "the injury to be caused by a breach of each and every one of the undertakings is uncertain and difficult to prove, and if the amount made payable would be held not to be a penalty if it were made payable for the breach of each one of the undertakings standing alone." *See* Corbin, *supra,* § 1066. Neither of these exceptions apply to the facts here.

**47.** In that regard, Mr. Rash testified that the fact that the Tulsa market was unknown to AMC, coupled with the fact that AMC had opened only one other megaplex theater, made financial projections for the Southroads 20 more difficult than projections for other AMC theaters.

evidence further supports AMC's argument that, at the time of contracting, it was reasonable to conclude that Southroads' failure to finish the completion date items could jeopardize AMC's relationship with its customers and that it was impracticable to quantify such harm. In fact, it is the potential for this type of harm that makes a stipulated damage provision particularly appropriate. *See Lawyers Title Ins. Corp. v. Dearborn Title Corp.,* 118 F.3d 1157, 1161 (7th Cir.1997) (Posner, J.) (A "diminution of future contractual opportunities ... would be difficult to quantify, making a provision for liquidated damages highly appropriate.").[48] In sum, AMC has met its burden of proving that, at the time of contracting, the damages that AMC would suffer as a result of Southroads' failure to meet its Completion Date obligations were difficult to ascertain.

■■■ Despite the court's conclusion that the damages resulting from Southroads' breach of the Turnover Date clause and/or the Completion Date clause were difficult to ascertain at the time of contracting, Oklahoma law mandates that the provision nonetheless be deemed void if the provision actually imposes a penalty. *See Sun Ridge Investors, Ltd. v. Parker,* 956 P.2d 876, 877 (Okla.1998); *Waggoner v. Johnston,* 408 P.2d 761, 768–69 (Okla. 1965). In other words, the court must consider whether the stipulated damages owing to AMC under Article 5 are clearly disproportionate to the probable actual harm suffered by AMC. *See B & B Lines, Inc. v. Ryan Freight Lines, Inc.,* 601 P.2d 1207, 1209 (Okla.App.1979) (liquidated damages are permitted where the actual damages are by their nature uncertain and where they are not clearly disproportionate to probable actual harm). The court turns, then, to that inquiry.

*C. Reasonable Pre–Breach Estimate of Probable Loss or Reasonably Proportionate to Probable Actual Harm*

■■■ In analyzing a stipulated damage provision, the Supreme Court of Oklahoma has instructed that "the most important fact[ ] to be considered [is] ... whether the stipulated amount is a reasonable estimate of probable damages or is reasonably proportionate to the actual damage sustained at the time of the breach." *See Waggoner v. Johnston,* 408 P.2d 761, 769– 70 (Okla.1965) (citations omitted). As subsequent decisions clarified, however, where actual damages are by their nature uncertain, liquidated damages are permitted where they are not clearly disproportionate to *probable* actual harm. *See B & B Lines, Inc. v. Ryan Freight Lines, Inc.,* 601 P.2d 1207, 1209 (Okla.App.1979).

Southroads contends that the stipulated sum as it relates to the Turnover Date is unconscionable because AMC suffered no actual losses as a result of Southroads' breach of the Turnover Date clause. Specifically, Southroads argues that AMC, at the time of the lease amendment or shortly thereafter, had no intention of opening prior to the 1997 holiday season and, thus, was not delayed by Southroads' conduct and did not lose any income. As set forth in the above findings of fact, however, the court is simply not persuaded by Southroads' evidence on this issue. Put briefly, the court is persuaded that AMC could have started work on its pad site by mid-December 1996 if Southroads had turned over a properly certified pad in November 1996 and that AMC, in all likelihood, would have been able to open its theater in the summer months of 1997. The court is also persuaded that AMC, in December 1996, was still anticipating a Summer 1997 opening. Of course, Southroads did not turn over the pad site until much later and, as a result, AMC was not able to open its the-

**48.** The problem with the particular stipulated damage provision agreed upon by the parties, however, is that, with respect to the Completion Date, the stipulated sum is grossly dis- proportionate to the probable actual loss that AMC suffered as a result of Southroads' breach of the Completion Date. *See* discussion *infra* Part II.C.

ater until the holiday season of 1997. Ultimately, then, the court concludes that AMC did in fact suffer losses, primarily in the form of lost revenues, as a result of Southroads' breach of the Turnover Date clause.

■ Moreover, the court is persuaded that the stipulated sum as it relates to the Turnover Date is reasonably proportionate to the probable actual harm that AMC suffered in connection with Southroads' breach of the Turnover Date clause. AMC's evidence demonstrates that Southroads delayed the opening of the Southroads 20 by approximately four months. During this four-month period, then, AMC was clearly unable to earn income it would have been earning but for Southroads' delay. In fact, the Southroads 20 generated $14,093 in operating income per day during the first four and one-half months it was open-a period during which the theater had no comparable competition in the Tulsa market. Thus, if the theater had been able to open during the summer months, as planned, then AMC would have had a longer period of operation in which it was the only megaplex in Tulsa. While earnings may not have been as great during the summer months as compared to the holiday season,[49] the court draws the inference from the evidence presented at

trial that the Southroads 20 would have earned at least as much as the stipulated sum of $9,836 per day. AMC has convinced the court that the stipulated sum is a reasonable pre-breach estimate of AMC's probable loss with respect to Southroads' breach of the Turnover Date clause. Because AMC has met its burden of proof with respect to the Turnover Date, the court concludes that AMC is entitled to recover liquidated damages in the amount of $1,607,167.30, including default interest, plus per diem interest in the amount of $17,303.64,[50] based on Southroads' breach of the Turnover Date clause in the lease.[51]

■ With respect to the Completion Date clause, Southroads maintains that the stipulated damage provision is unconscionable in light of the actual damages that AMC probably suffered as a result of Southroads' breach of that clause. The court agrees. The principal category of damages about which AMC complains with respect to Southroads' breach of the Completion Date clause is lost customers-customers who, according to AMC, either had negative experiences at the Southroads 20 because of the unfinished nature of the center or simply did not know that the theater was open based on the appearance of the center. In other words, AMC seeks

49. According to the testimony at trial, theaters typically earn greater revenues during the holiday season because of the increased number of "blockbuster" movies that are released during that time.

50. AMC's damages calculations are current through September 6, 2000. According to AMC, the per diem interest on the Turnover Date damages is $422.04. Southroads has not objected to this amount. Thus, the court has simply multiplied this figure by the number of days from September 6, 2000 through the date of judgment.

51. Southroads contends that if AMC is entitled to recover damages with respect to the Turnover Date, AMC may only recover damages for the first 30 days of delay. According to Southroads, the parties intended that the stipulated damages set forth in Article 5 were to be paid only for the 30 days between the Turnover Date and the Outside Turnover Date, because AMC had the right to terminate

the lease at the Outside Turnover Date. Southroads' argument, however, finds little support in the language of the lease itself. The lease did not require AMC to terminate the lease at the Outside Turnover Date, it merely provided AMC with the right to do so if AMC so desired. Moreover, the lease does not state that one remedy shall be exclusive of another remedy. In fact, Article 37(A) of the lease expressly provides that all rights and remedies under the lease "shall be cumulative, irrespective of whether so expressly stated." In any event, Article 5 itself expressly provided AMC the right to terminate the lease *"in addition to its other rights and remedies "* if Southroads failed to deliver a properly certified pad by the Outside Turnover Date. For these reasons, the court rejects Southroads' argument that AMC is precluded from recovering damages for the period beyond the Outside Turnover Date.

to recover stipulated damages with respect to the Completion Date primarily for a period of time during which the Southroads 20 was open for business.[52] Stated another way, AMC seeks more than $9,800 per day in stipulated damages for a period of time in which AMC was actually earning approximately $14,000 per day in operating income. In essence, then, AMC seeks to gain more than $23,000 per day during this time period-a period in which AMC had projected just one month prior to opening that the Southroads 20 would earn only $6,000 per day in operating income. In the face of much evidence demonstrating that the performance of the Southroads 20 far exceeded the expectations of AMC, it is difficult to conclude that AMC suffered actual losses anywhere near the stipulated sum.

Moreover, while the court has no doubt that some AMC theater patrons had negative experiences during the first few months that the Southroads 20 was open for business, the court is simply not persuaded that these experiences or the conditions at the Southroads shopping center had any dramatic impact on AMC's goodwill over time. AMC's best evidence that it suffered a loss of goodwill is that evidence showing a gradual decline in the performance figures for the Southroads 20. But this decline is far more likely attributable to the increased competition in the Tulsa market (with the resulting market effects) rather than to the conditions at the Southroads 20. Significantly, the conditions at the center about which AMC complains (and about which AMC received complaints from customers) were temporary in nature. Thus, by the time AMC

was experiencing a decline in performance (not coincidentally, near the time when another megaplex opened across the street from the Southroads 20), the problems at the Southroads had been remedied. For these reasons, the court is not convinced that the decline in the performance of the Southroads 20 was due to the conditions at the center.[53]

Finally, to the extent the conditions at the Southroads center had any impact on AMC's goodwill, the court is unconvinced that the impact is attributable to Southroads' breach of the Completion Date clause. Most of the completion date items were finished by the time AMC opened its doors on November 21, 1997, including AMC's north parking lot; the exit corridor; the left-turn lane at the South Yale Avenue entrance; and the regrading work. Although Mr. Burns testified at trial that 95 percent of all customer complaints received related to the pedestrian access, there is no evidence that AMC bargained for any access other than the one that was completed by opening day. Thus, to the extent patrons had negative experiences related to the pedestrian access, the blame lies more properly on AMC for lack of foresight rather than on Southroads.

For all of the foregoing reasons, AMC has failed to satisfy its burden of showing that the stipulated sum with respect to the Completion Date is a reasonable pre-breach estimate of probable loss or reasonably proportionate to AMC's probable actual loss. The court concludes that the stipulated sum with respect to the Completion Date is clearly disproportionate to AMC's probable actual harm and, as such,

52. Indeed, the vast majority of days for which AMC seeks to recover stipulated damages with respect to the Completion Date (November 21, 1997 through July 31, 1998) are days on which the theater was open and earning income.

53. In closing arguments, counsel for AMC made an analogy between the conditions at the Southroads center (and AMC's argument that it lost customers because of those conditions) and his own experiences with an AMC

megaplex in Kansas City. According to counsel, he always chooses one particular AMC theater in town over another particular AMC theater because he dislikes the parking lot at the other-a parking lot that is strangely configured and frustrating to negotiate. Ironically, counsel's example illustrates the problem with AMC's argument here-there was no evidence at trial of any permanent problems that might cause patrons to choose another theater over the Southroads 20.

**1214**

cannot be enforced. *See B & B Lines, Inc. v. Ryan Freight Lines, Inc.*, 601 P.2d 1207, 1209 (Okla.App.1979). Thus, the court finds in favor of Southroads on AMC's claim for liquidated damages related to the Completion Date.[54]

### D. Remaining Issues

With respect to Southroads' counterclaim for unpaid rent and other charges, the court concludes that Southroads is not entitled to recover from AMC the amount paid for 1998 real estate taxes. Although Mr. Hayes assumes that Southroads provided to AMC the requisite documentation under the lease, no evidence was introduced at trial that Southroads in fact sent the requisite documentation to AMC. Southroads has failed to meet its burden on this issue and, by the express terms of the lease, AMC is excused from paying real estate taxes for 1998. The court will therefore deduct $42,224.87 from the amount owed to Southroads in unpaid rent and other charges ($2,504,264.72), leaving a principal balance of $2,462,039.85. With respect to interest due on the amount, AMC maintains that Southroads is not entitled to accrue interest on the amount until all amounts due AMC are offset against the principal balance owed to Southroads. In other words, in light of the court's conclusion that Southroads owes AMC $1.6 million, AMC contends that it is not obligated to pay interest on any amounts owed to Southroads until that

amount exceeds $1.6 million. The language of the lease seems to support AMC's theory and Southroads has not argued otherwise.[55] Thus, the court will calculate interest on the amount due Southroads for unpaid rent and other charges only from the time at which the balance exceeded $1.6 million. According to the court's calculations, the interest due on that amount is $208,117.84.[56] Thus, the total amount due Southroads on its claim for unpaid rent and other charges is $2,670,157.69. Based on the parties' stipulation, the court will offset from this amount the construction allowance owed to AMC, plus default interest, or the amount of $996,838.09, plus per diem interest of $12,151.17,[57] for a total net result of $1,661,168.43.

The final issue before the court is the parties' requests for attorneys' fees pursuant to Article 37(B) of the lease, which provides that "the prevailing party" shall be entitled to recover all expenses, including reasonable attorneys' fees, incurred in connection with a suit based on a breach of the lease. Because the lease agreement is governed by Oklahoma law, the court looks to Oklahoma law for the meaning of the phrase "prevailing party." *See Harris Market Research v. Marshall Marketing & Communications, Inc.*, 948 F.2d 1518, 1527 (10th Cir.1991) (where contract was governed by Kansas law, "prevailing party" was defined by Kansas

---

**54.** Even if the court were to apply Missouri law and place the burden on Southroads to prove that the stipulated sum with respect to the Completion Date constitutes an unenforceable penalty, the court would reach the same conclusion. Not only has AMC failed to convince the court that the provision with respect to the Completion Date is not a penalty, but Southroads has convinced the court that it is.

**55.** Southroads has simply submitted a spreadsheet calculating interest from the first month in which AMC failed to pay rent.

**56.** The court, of course, has arrived at this figure without the benefit of the parties' own calculations of interest consistent with this

ruling. While the court would hope that the parties could come to an agreement with respect to the appropriate amount of interest due, the court would invite either party to file a motion to alter or amend the judgment on this issue should the court's calculation be in error and should the parties be unable to agree on the appropriate amount.

**57.** AMC's damages calculations are current through September 6, 2000. According to AMC, the per diem interest on the construction allowance is $296.37. Southroads has not objected to this amount. Thus, the court has simply multiplied this figure by the number of days from September 6, 2000 through the date of judgment.

law). Oklahoma has specifically rejected the rule that the party with the greatest affirmative judgment is the only prevailing party and has held that if both parties receive affirmative judgments in their favor, then both parties are entitled to attorneys' fees and costs. *See Stites v. Duit Construction Co.*, 992 P.2d 913, 916–17 (Okla.App.1999) (citing *Midwest Livestock Systems, Inc. v. Lashley*, 967 P.2d 1197 (Okla.1998) and *Welling v. American Roofing & Sheet Metal Co.*, 617 P.2d 206 (Okla. 1980)). Thus, because both AMC and Southroads have obtained affirmative judgments in their favor, both parties are entitled to recover expenses, including reasonable attorneys' fees, under the lease.

Although Local Rule 54.2 applies by its terms to statutory attorneys' fees, the court orders the parties to comply with the procedures set forth in that rule, including the provision for consultation between the parties, to facilitate an actual award of fees to both parties. *See* D. Kan. Rule 54.2.

**IT IS THEREFORE ORDERED BY THE COURT THAT** judgment be entered in favor of plaintiff AMC against defendant Southroads on AMC's claim for liquidated damages with respect to the Turnover Date in the amount of $1,624,470.94, including default and per diem interest, and that judgment be entered in favor of defendant Southroads on AMC's claim for liquidated damages with respect to the Completion Date.

**IT IS FURTHER ORDERED BY THE COURT THAT** judgment be entered in favor of defendant Southroads against plaintiff AMC on its claim for unpaid rent and other charges in the amount of $1,661,168.43, including default and per diem interest.