**FIREWORKS SPECTACULAR, INC. and Piedmont Display Fireworks, Inc., Plaintiffs,**

v.

**PREMIER PYROTECHNICS, INC. and Matthew P. Sutcliffe, Defendants.**

**No. CIV. A. 99–2240–GTV.**

United States District Court, D. Kansas.

May 17, 2001.

Dennis M. Clyde, Clyde & Wood, L.L.C., Overland Park, KS, for Plaintiffs.

Robert S. Tomassi, Loy & Tomassi, P.A., Pittsburg, KS, Karen Glickstein, Cheryl L. Burbach, Shughart, Thomson & Kilroy, P.C., Kansas City, MO, for Defendants.

## MEMORANDUM AND ORDER

VANBEBBER, Senior District Judge.

Plaintiffs filed this diversity action against Defendants alleging breach of a non-compete agreement, misappropriation of trade secrets, and breach of fiduciary duty. The case was tried to the court on August 15, 2000. After carefully considering the testimony of the witnesses, the exhibits, and the briefing submitted by the parties, the court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### I. Findings of Fact

1. Plaintiff Fireworks Spectacular, Inc. ("Fireworks Spectacular") is a Kansas corporation with its principal place of business in Pittsburg, Kansas.

2. Plaintiff Piedmont Display Fireworks, Inc. ("Piedmont") is a Kansas corporation with its principal place of business in Pittsburg, Kansas.

3. Defendant Matthew P. Sutcliffe is a resident of Missouri.

4. Defendant Premier Pyrotechnics, Inc. ("Premier Pyrotechnics") is a Missouri corporation with its principal place of business in Dixon, Missouri.

5. Plaintiffs are engaged in the business of selling fireworks. Fireworks

Spectacular sells fireworks for retail and conducts fireworks displays or shows for customers.

6. Piedmont sells fireworks for wholesale to distributors and persons who want to shoot their own fireworks shows.

7. Fireworks Spectacular and Piedmont have common ownership, officers, and directors. For all practical purposes, they are treated as one and the same.

8. Mr. Sutcliffe began purchasing consumer fireworks from a fireworks store in Clinton, Missouri. That fireworks store was operated by Michael Collar who, at that time, was the President of Fireworks Spectacular.

9. In 1996, Mr. Collar approached Mr. Sutcliffe about shooting off fireworks displays. Mr. Sutcliffe shot three shows for which he was compensated by Plaintiffs.

10. Mr. Sutcliffe then approached Mr. Collar about the possibility of him selling fireworks shows for Mr. Collar's company. Mr. Collar agreed to pay Mr. Sutcliffe a commission for any sales that he made. Mr. Sutcliffe made several sales for which he was paid a sales commission by Plaintiffs.

11. In March of 1997, Mr. Sutcliffe began working for Plaintiffs in Pittsburg, Kansas as a full-time hourly employee. Plaintiffs paid Mr. Sutcliffe $7.50 per hour, plus a sales commission for all shows that he sold, and a shooter's fee for all shows that he shot.

12. Within a few months, Plaintiffs approached Mr. Sutcliffe about entering into a non-compete agreement. Mr. Sutcliffe expressed a willingness to enter into such an agreement; however, neither he nor Plaintiffs discussed the specific terms for any such agreement.

13. In June of 1997, Plaintiffs directed their attorney to prepare a written employment agreement to be entered into between Fireworks Spectacular and Mr.

Sutcliffe. That agreement included, among other things, a covenant not to compete which provided the following:

[Mr. Sutcliffe] warrants and agrees that during the term of this agreement or any renewal thereof and for a period of five (5) years after the date of the termination or nonrenewal of this agreement, [Mr. Sutcliffe] will not:

A. Compete with [Fireworks Spectacular] in any manner or establish, open, be engaged in, or in any manner whatsoever become interested, directly or indirectly, as employee, owner, partner, agent, stockholder, director, officer or otherwise, in any business, trade or occupation which competes with the business of [Fireworks Spectacular] within the area hereinafter set forth.

B. Solicit, market, promote or attempt to sell products or services to any [Fireworks Spectacular] customer, dealer or retailer for any products or services other than those which are purchased from [Fireworks Spectacular], and will not introduce any [Fireworks Spectacular] customer, dealer or retailer to any competing products or solicit, request or encourage any [Fireworks Spectacular] customer, dealer or retailer to buy, sell, market or handle any products other than those specifically sold to such person or party by [Fireworks Spectacular].

C. After termination or expiration of this agreement, solicit [Fireworks Spectacular] customers, dealers and retailers or sell any goods or services to them and shall not engage in competition with [Fireworks Spectacular] in any manner whatsoever.

14. Plaintiffs presented the written employment agreement to Mr. Sutcliffe, who refused to sign it. Mr. Sutcliffe told Mr. Collar that he was not willing to sign the

agreement, because he wanted to show it to his attorney, and he was not fully satisfied with its terms.

15. Plaintiffs made no meaningful attempts thereafter to obtain Mr. Sutcliffe's signature on the written employment agreement.

16. A few months later, Plaintiffs and Mr. Sutcliffe re-negotiated the terms of Mr. Sutcliffe's employment. Plaintiffs agreed to pay Mr. Sutcliffe a base salary of $20,000 per year, plus a specified sales commission and bonus. In exchange, Mr. Sutcliffe agreed, among other things, to sign a non-compete agreement with Plaintiffs.

17. Plaintiffs continued to employ Mr. Sutcliffe throughout 1997 and 1998, compensating him with a base salary of $20,000, plus the sales commission that was agreed upon in the re-negotiation. During that time, however, Plaintiffs never presented, and Mr. Sutcliffe never signed, any non-compete agreement.

18. In the fireworks industry, the identity of potential customers is not information that is readily available to the public. There is no known source from which one can ascertain the identity of persons who display fireworks or who may be interested in purchasing fireworks.

19. At all times relevant to this lawsuit, the most common and useful way to acquire customers was through "cold-calling," an often lengthy and costly process.

20. Plaintiffs maintain computerized lists containing information about the customers with whom they come into contact. Those lists include some or all of the following information with respect to each customer: the name, address, and telephone number of the customer; the "con-tact person" for the customer; the name of the sales person with whom the customer works; and the date and amount of money involved in any fireworks shows performed by the customer.

21. Plaintiffs limit the access of those computerized lists to certain employees.

22. Plaintiffs permitted Mr. Sutcliffe access to the computerized lists during his employment.

23. Plaintiffs maintain a policy of keeping the identity of their customers confidential. They often remind their employees about the importance of that policy.

24. At all times relevant to this lawsuit, Mr. Sutcliffe knew that Plaintiffs maintained a policy of keeping their customer information confidential, and that Plaintiffs expected him to keep their customer information confidential.

25. While soliciting sales for Plaintiffs, Mr. Sutcliffe made notes in a personal logbook concerning the customers with whom he came into contact. Those notes contained information similar to that contained in Plaintiffs' computerized lists.[1]

26. On January 6, 1999, Mr. Sutcliffe quit his employment with Plaintiffs and started a competing business of his own-Defendant Premier Pyrotechnics.

27. Mr. Sutcliffe retained the notes that he kept in his logbook and copies of Plaintiffs' computerized lists when he left his employment with Plaintiffs.

28. Mr. Sutcliffe disclosed the contents of the notes and the computerized lists to Premier Pyrotechnics without Plaintiffs' authorization.

29. Premier Pyrotechnics, by and through its agents (including Mr. Sut-

---

**1.** At some point, Mr. Sutcliffe stopped writing his notes in a logbook and began typing them into a personal computer at his home. The court treats all of Mr. Sutcliffe's notes as one and the same and, for simplicity, refers to them in this opinion as being kept in a logbook.

cliffe), solicited customers on its own behalf using the notes and the computerized lists without authorization from Plaintiffs.

30. By using the notes and the lists, Premier Pyrotechnics was able to engage in immediate and meaningful competition with Plaintiffs, without first creating a customer database of its own.

31. Premier Pyrotechnics eventually sold fireworks to at least seventeen customers included on the computerized lists. Plaintiffs likely would have sold fireworks to those customers had Premier Pyrotechnics not done so: Each of the seventeen customers had purchased fireworks from Plaintiffs in the previous year, and Plaintiffs normally retain ninety percent of their customers from year to year.[2]

32. At least two of the seventeen customers were located in Kansas.

33. Mr. Sutcliffe believes that Premier Pyrotechnics likely would have lost money during its first year of business without the aid of Plaintiffs' customer information.

34. On February 23, 2000, this court issued an order enjoining Mr. Sutcliffe from "soliciting, marketing, promoting, introducing, or attempting to sell products or services to any ... customer listed on [the computerized lists] on behalf of Premier Pyrotechnics or any other fireworks provider" and Defendants from "appropriating, copying, using, or disclosing any of [P]laintiffs' customer lists," including the notes and the computerized lists.

35. On March 14, 2000, counsel for Plaintiffs drafted a letter to Plaintiffs' customers, advising them of the court's order.

36. Counsel for Plaintiffs forwarded the letter to Ann Cooke, Office Manager for Plaintiffs. He directed Ms. Cooke to send a copy of the letter, along with a copy of the court's order, to relevant customers listed on the computerized lists.

37. Ms. Cooke sent the letter to eleven customers, enclosing a copy of the February 23, 2000 order with each letter. In addition, however, because the counsel's letter and the court's order made reference to Plaintiffs' computerized lists, she erroneously believed that she was also to send a copy of the computerized lists. She, therefore, enclosed a copy of the computerized lists with each letter.

38. One customer who received the letter (and the computerized lists) was Mr. Bowles. At the time Ms. Cooke sent the letters, neither Mr. Bowles, nor Mr. Bowles's company, appeared on the computerized lists. Ms. Cooke sent the letter to Mr. Bowles because she believed his absence from the lists was due to oversight.

39. Once Plaintiffs learned that Ms. Cooke had sent a copy of their computerized lists to eleven customers, they took immediate action to maintain the secrecy of the lists. Ms. Cooke contacted ten of the eleven customers by telephone, and informed them that they had received the lists by mistake; that the lists constituted trade secrets of Plaintiffs; that any use or disclosure of their contents would be unauthorized; and that the lists and any copies thereof should be returned immediately to Plaintiffs. In addition, counsel for Plaintiffs sent each of the eleven customers a

---

2. Defendants point out that Plaintiffs did not submit a competing bid for the sale of fireworks to several of the customers at issue. They argue, therefore, that it is not likely that Plaintiffs would have sold fireworks to those customers had Defendants not done so. The court disagrees with Defendants' contention.

The court finds that Plaintiffs failed to send a competing bid only under circumstances where to do so would have been futile. In most instances, the customer had already accepted a contract with Defendants, or declined to accept a bid from Plaintiffs because they were already working with Defendants.

letter by certified mail, explaining that the customers had received the lists as the result of mistake, and that any use or disclosure of their contents would be deemed a misappropriation of Plaintiffs' trade secrets.

40. Ten of the eleven customers immediately returned the lists to Plaintiffs. The eleventh customer, Mr. Bowles, did not return the lists; however, he did not disclose the lists or their contents to anyone other than his family, Mr. Sutcliffe, and Mr. Sutcliffe's wife.

## II. Conclusions of Law

### A. Jurisdiction

The court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiffs and Defendants are citizens of different States. The court has personal jurisdiction over Defendants. Venue is proper in the District of Kansas pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events giving rise to the claims occurred in Kansas.

### B. Non–Compete Agreement [3]

 Plaintiffs attempt to enforce the written non-compete agreement that Mr. Sutcliffe refused to sign. They argue that the agreement is enforceable because Mr. Sutcliffe orally agreed to its terms. The court concludes that, even if Mr. Sutcliffe orally agreed to its terms, the agreement is unenforceable under the Kansas Statute of Frauds.

The Kansas Statute of Frauds, K.S.A. § 33–106 (1993), requires an agreement to be in writing if it "is not to be performed within the space of one year from the making thereof." The agreement in this case does not meet the statute's requirements: It is not signed by both parties, and it purports to restrain Mr. Sutcliffe from competition for a period of five years following the termination of his employment with Plaintiffs.

 To justify enforcement of the agreement despite the statute of frauds, Plaintiffs point to the doctrine of promissory estoppel. Kansas law permits the doctrine of promissory estoppel to overcome a statute of frauds defense in certain factual situations. See *Bittel v. Farm Credit Servs. of Cent. Kan., P.C.A.*, 265 Kan. 651, 962 P.2d 491, 497 (1998). In *Decatur Coop. Assoc. v. Urban*, the Kansas Supreme Court stated:

> [T]he doctrine of promissory estoppel may render enforceable any promise upon which the promisor intended, or should have known, that the promisee would act to his detriment, and which is indeed acted upon in such a manner by the promisee, where application of the statute of frauds to that promise would thus work a fraud or a gross injustice upon the promisee.

Before the doctrine of promissory estoppel can be invoked in a case involving the statute of frauds the promisee must first show by competent evidence that a valid and otherwise enforceable contract was entered into by the parties.

 In order for the doctrine of promissory estoppel to be invoked the evidence must show that the promise was

---

**3.** As a federal court sitting in Kansas, the court applies the choice of law rules for Kansas. See *Am. Multi–Cinema, Inc. v. Southroads, L.L.C.*, 119 F.Supp.2d 1190, 1203 (D.Kan.2000) (citations omitted). "Kansas courts apply the doctrine of *lex loci contractus*, which requires that the court interpret the contract according to the law of the state in which the parties performed the last act necessary to form the contract." *Id.* (citation omitted). The agreement at issue in this case was allegedly entered into in Kansas; therefore, the court applies Kansas law.

made under circumstances where the promisor intended and reasonably expected that the promise would be relied upon by the promisee and further that the promisee acted reasonably in relying upon the promise. Furthermore, promissory estoppel should be applied only if a refusal to enforce it would be virtually to sanction the perpetration of fraud or would result in other injustice.

*Decatur Coop. Assoc. v. Urban,* 219 Kan. 171, 547 P.2d 323, 329–30 (1976) (citations and internal quotation marks omitted). The court concludes that, in the circumstances of this case, the doctrine of promissory estoppel does not justify enforcement of the agreement.

Foremost, after the benefit of a full trial on the merits, the court holds serious doubt as to whether Mr. Sutcliffe ever orally agreed to the terms of the written agreement. While the evidence is clear that Mr. Sutcliffe orally agreed to enter into a non-compete agreement, the evidence is far from clear that Mr. Sutcliffe agreed to enter into the specific non-compete agreement at issue in this case. Nevertheless, even if Mr. Sutcliffe promised to sign the written agreement, and thus orally agreed to its terms, the court finds no reasonable reliance on the part of Plaintiffs.

To invoke the doctrine of promissory estoppel, Plaintiffs must establish not only that Mr. Sutcliffe made a promise to sign the written agreement, but that they acted reasonably in relying upon that promise. See *id.* Any oral promise that Mr. Sutcliffe made concerning the written agreement in this case occurred in mid to late 1997. Plaintiffs continued to employ Mr. Sutcliffe thereafter, throughout 1997 and 1998, without making any meaningful attempts to obtain his signature on the agreement. Plaintiffs offer virtually no explanation for their failure to obtain Mr. Sutcliffe's signature, for more than twelve months, on a document that they claim he was willing to sign. Under those circumstances, the court finds no reasonable reliance.

The non-compete agreement at issue is unenforceable under the statute of frauds. The court lifts the preliminary injunction entered against Mr. Sutcliffe on February 23, 2000 to the extent it enjoins Mr. Sutcliffe from engaging in fair competition, using fair and proper means, to solicit customers of Plaintiffs.

## C. Trade Secrets [4]

▮▮▮▮ Plaintiffs allege that Defendants misappropriated their trade secrets in violation of the Kansas Uniform Trade Secrets Act, K.S.A. § 60–3320 et seq. (1994). "In an action claiming unauthorized use of a trade secret, the threshold inquiry is whether or not there [is] a trade secret to be misappropriated." *All West Pet Supply Co. v. Hill's Pet Prods. Div., Colgate–Palmolive Co.,* 840 F.Supp. 1433, 1437 (D.Kan.1993) (citing *Koch Eng'g Co. v. Faulconer,* 227 Kan. 813, 610 P.2d 1094, 1104 (1980)). Whether or not a trade secret exists is a question of fact. See *id.*

▮▮▮▮ Plaintiffs contend that their computerized lists and the notes kept by Mr. Sutcliffe constitute protected trade secrets. According to K.S.A. § 60–3320(4), "trade secret" means:

---

4. As a federal court sitting in Kansas, the court applies the choice of law rules for Kansas. See *Am. Multi Cinema, Inc.,* 119 F.Supp.2d at 1203 (citations omitted). Kansas courts apply the doctrine of *lex loci delicti,* which requires a court to evaluate a tort claim according to the law of the state where the tort occurred. See *Ling v. Jan's Liquors,* 237 Kan. 629, 703 P.2d 731, 735 (1985). A tort occurs where the injury occurs. See *id.* Because any injuries arising out of this claim occurred in Kansas, the court applies Kansas law.

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Customer lists and other customer information may constitute a trade secret." *All West Pet Supply Co.*, 840 F.Supp. at 1438 (citations omitted); see *Curtis 1000, Inc. v. Pierce*, 905 F.Supp. 898, 901 (D.Kan.1995). Customer lists containing merely public information that can easily be compiled by third parties will not be protected as trade secrets; however, where the party "compiling the customer lists, while using public information as a source, . . . expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection." *Robert B. Vance & Assocs., Inc. v. Baronet Corp.*, 487 F.Supp. 790, 799 (N.D.Ga.1979).

The court concludes that the lists and the notes at issue in this case constitute protected trade secrets. The lists and the notes derive economic value from the fact that they contain valuable customer information that is not generally known or readily ascertainable by persons in the fireworks industry. Plaintiffs invested a great amount of time, effort, and expense in developing their customer information—including hundreds of hours of "cold-calling." While the information contained on the lists and the notes is ultimately ascertainable from public sources, it is not readily ascertainable from public sources: A third party wishing to duplicate the information could not do so without invest-

ing a significant amount of time, effort, and expense—similar to that which Plaintiffs invested. Moreover, Plaintiffs make efforts that are reasonable under the circumstances to maintain the secrecy of the customer information. Plaintiffs limit the access of their lists to certain employees, and maintain a strict policy of keeping all customer information confidential.

 The court determines it irrelevant that the lists were created in part by Mr. Sutcliffe, and that the notes were kept by Mr. Sutcliffe in a personal logbook. Both the lists and the notes are the property of Plaintiffs. See *Morrison v. Woodbury*, 105 Kan. 617, 185 P. 735, 737 (1919) (giving trade secret protection to the plaintiff's customer books where "the defendant helped to make the original books and from time to time added memoranda to them, showing the dates and expirations of [insurance] policies which he had written while in the plaintiff's employ"). At all times during the creation of the notes and his contributions to the lists, Mr. Sutcliffe was an agent of Plaintiffs, soliciting customers on behalf of Plaintiffs, and accepting a sales commissions from Plaintiffs.

 The court notes that it reaches its conclusion despite the fact that Plaintiffs inadvertently disclosed copies of their lists to eleven customers in March of 2000. Kansas law recognizes the possibility for a trade secret to be inadvertently disclosed without ceasing to exist. See K.S.A. § 60–3320(2)(ii)(C) (defining "misappropriation" to include the "disclosure or use of a trade secret of another without express or implied consent by a person who before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake"). In this case, Plaintiffs' lists were disclosed as the result of a good-faith mistake. Upon learning of that mistake, Plaintiffs took immediate action to maintain the secrecy

of the customer information that was contained on the lists. Ten of the eleven customers returned the lists to Plaintiffs immediately. The eleventh customer, Mr. Bowles, did not return the lists, but also did not disclose the lists (or their contents) to anyone other than his family, Mr. Sutcliffe, and Mr. Sutcliffe's wife.[5]

■ Having determined that the lists and the notes constitute protected trade secrets, the court turns to the question of misappropriation. K.S.A. § 60–3320(2) defines "misappropriation" as the:

(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

. . . .

(B) at the time of the disclosure or use, knew or had reason to know that his knowledge of the trade secret was

. . . .

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use. . . .

The court concludes that Mr. Sutcliffe is liable for misappropriation of Plaintiffs' trade secrets. As an agent and employee of Plaintiffs, Mr. Sutcliffe acquired the confidential customer information contained on the lists and the notes under circumstances giving rise to a duty to maintain its secrecy and to limit its use. Mr. Sutcliffe knew it was the policy of Plaintiffs to keep their customer information confidential, and that Plaintiffs expected him to keep their customer information confidential. Nevertheless, without authorization from Plaintiffs, he disclosed the lists and the notes to Premier Pyrotechnics, and used the lists and the notes to solicit customers on behalf of Premier Pyrotechnics.

■ The court concludes that Premier Pyrotechnics also is liable for misappropriation of Plaintiffs' trade secrets. Premier Pyrotechnics used the lists and the notes to solicit customers on its own behalf, without authorization from Plaintiffs, under circumstances where it knew, or should have known, that its knowledge of the lists and the notes was derived from a person owing a duty to Plaintiffs to maintain its secrecy.

■ Plaintiffs are entitled to recover damages caused by Defendants' misappropriations. See K.S.A. § 60–3322. Plaintiffs contend that, as a result of the misappropriations, they sustained damages of lost profits in the total amount of $167,430.62. The following table explains Plaintiffs' calculation:

| Customer | Lost Profit |
| --- | --- |
| F.O.P. | $ 6,836.27 |
| B.R. | $ 531.70 |
| T.B. | $ 290.49 |
| B.S. USA | $ 1,041.58 |
| C.M. | $ 13,845.70 |
| C.S. | $ 1,070.98 |
| C.C. | $ 801.67 |
| D.G.N. | $ 3,710.23 |
| F. | $ 18,346.16 |
| H. | $ 1,843.31 |
| Ki. | $ 7,111.91 |
| K. | $ 15,662.40 |
| L.S.L. | $ 5,012.87 |
| La. | $ 1,357.15 |
| Le. | $ 6,454.88 |
| P.S. | $ 76,077.81 |
| S. | $ 6,879.20 |
| S.S. | $ 556.31 |
| Total | $167,430.62 [6] |

---

5. No evidence before the court indicates that Mr. Bowles, or any other recipient of the lists, materially changed his position before learning that he had received the lists as the result of mistake.

6. The court notes that the figures included in this table are taken from Plaintiffs' Exhibit 21, which was admitted into evidence at trial. The court does not state the actual names of the customers to protect the secrecy of Plaintiffs' customer lists.

The court determines, however, that Plaintiffs sustained damages of lost profits in the total amount of $82,217.53. The reason for the difference between Plaintiffs' calculation and the court's calculation is twofold: First, Plaintiffs did not establish damages caused by Defendants' misappropriations with respect to customer "P. S." At the time of the misappropriations, neither the lists nor the notes contained information concerning "P. S." or its owner, Mr. Bowles. It is the tangible customer lists and notes, as opposed to the customers themselves, that are the protected trade secrets. See *Garst v. Scott*, 114 Kan. 676, 220 P. 277, 278 (1923); see also *BioCore, Inc. v. Khosrowshahi*, 96 F.Supp.2d 1221, 1235 (D.Kan.2000) (stating that "courts generally provide trade secret protection only to tangible customer lists"). Second, Plaintiffs testified that they normally retain only ninety percent of their customers from year to year. The court, therefore, subtracts $76,077.81 (the amount of sales to "P. S.") from $167,430.62 (Plaintiffs' proposed calculation) to arrive at the sum of $91,352.81. The court then awards to Plaintiffs ninety percent of that sum ($82,217.53).

K.S.A. § 60–3322(b) provides that the court may award exemplary damages if willful and malicious misappropriation is found to exist. Similarly, K.S.A. § 60–3323(iii) provides that the court may award reasonable attorney fees to the prevailing party if willful and malicious misappropriation is found to exist. The court does not find willful and malicious misappropriation in this case, and thus does not award exemplary damages or reasonable attorney fees.

### D. Breach of Fiduciary Duty [7]

Plaintiffs argue that Mr. Sutcliffe breached a fiduciary duty owed to them by "engaging in unfair competition, disclosing and using trade secrets and proprietary information of [Plaintiffs] for his own personal benefit and gain." Plaintiffs' Complaint ¶ 28. The court determines that, to the extent this claim is based upon Mr. Sutcliffe's misappropriation of trade secrets, it is duplicative of Plaintiffs' claim brought pursuant the Uniform Trade Secrets Act. The court further determines that, to the extent this claim is not based upon Mr. Sutcliffe's misappropriation of trade secrets, no breach occurred.

IT IS, THEREFORE, BY THE COURT ORDERED that judgment shall be entered in favor of Defendants on Plaintiffs' claim for breach of a non-compete agreement (Count II) and Plaintiffs' claim for breach of fiduciary duty (Count III).

IT IS FURTHER BY THE COURT ORDERED that the preliminary injunction entered against Mr. Sutcliffe on February 23, 2000 is lifted to the extent it enjoins Mr. Sutcliffe from engaging in fair competition, using fair and proper means, to solicit customers of Plaintiffs.

IT IS FURTHER BY THE COURT ORDERED that judgment shall be entered against Defendants on Plaintiffs' claim for misappropriation of trade secrets (Count I); Defendants shall pay to Plaintiffs damages in the amount of $82,217.53.

IT IS FURTHER BY THE COURT ORDERED that Defendants are permanently enjoined from appropriating, copy-

---

**7.** As a federal court sitting in Kansas, the court applies the choice of law rules for Kansas. See *Am. Multi–Cinema, Inc.*, 119 F.Supp.2d at 1203 (citations omitted). Kansas courts apply the doctrine of *lex loci delicti*, which requires a court to evaluate a tort claim according to the law of the state where the tort occurred. See *Ling v. Jan's Liquors*, 237 Kan. 629, 703 P.2d 731, 735 (1985). A tort occurs where the injury occurs. See *id.* Because any injuries arising out of this claim occurred in Kansas, the court applies Kansas law.

ing, using, or disclosing any of Plaintiffs' customer lists, including the computerized lists and the notes specifically at issue in this case, for the purpose of soliciting customers, or for any other reason, without the express permission of Plaintiffs. Defendants, their agents, and anyone else acting in concert with Defendants shall return to Plaintiffs any and all information pertaining to Plaintiffs' customer lists, including any originals or copies thereof (whether hand-written or in any other form) within five (5) days of the date of this order.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**