(205 P.3d 766)
No. 99,550

PROGRESSIVE PRODUCTS, INC., *Appellant,* v. TOM SWARTZ, MARVIN ROBARTS, CALVIN BUNNEY, and VIN MANUFACTURING, LLC, *Appellees.*

Opinion filed April 17, 2009.

*Kala Spigarelli* and *Lori Fleming*, of The Spigarelli Law Firm, of Pittsburg, for appellant.

*Troy A. Unruh*, of Wilbert & Towner, PA, of Pittsburg, for appellees.

Before MCANANY, P.J., PIERRON and STANDRIDGE, JJ.

STANDRIDGE, J.: Progressive Products, Inc. (PPI) manufactures and sells Ceram-Back, a ceramic coating for pipe elbows that significantly lengthens the life of the pipe. Tom Swartz, Marvin Robarts, and Calvin Bunney are former PPI employees who left PPI to start VIN Manufacturing, LLC (VIN), a competing company. PPI sued, alleging misappropriation of trade secrets and requesting relief in the form of a permanent injunction. After a bench trial, the district court determined Swartz, Robarts, Bunney, and VIN misappropriated PPI's trade secrets but found a permanent indefinite injunction inappropriate under the circumstances. To that end, the district court permitted VIN to continue manufacturing and selling ceramic coating for pipe elbows but ordered VIN to refrain from divulging, selling, or advertising any part of PPI's trade secrets for a period of 3 years. The court further ordered VIN to pay a 20 percent royalty on all sales for the next 3 years. PPI appealed, arguing the district court erred in imposing royalty payments instead of a permanent injunction. Swartz, Robarts, Bunney, and VIN (Appellees) filed a cross-appeal, arguing there was insufficient evidence to support the district court's finding that a trade secret had been misappropriated in the first place.

### The Evidence Presented At Trial

At the bench trial, Robert Allison of PPI described the events leading up to the company's formation. Allison explained that a long-standing problem in the pneumatic conveyance industry was abrasion caused by the transportation of dry solids through pipes

or tubing. In 1974, Allison discovered a new method of coating elbows which eventually led to PPI's incorporation.

In 1980, Allison approached Roger Messenger, who agreed to manufacture the coated elbows for PPI. Messenger refined Allison's coating formula, which eventually was given the name "Ceram-Back." At the time of the bench trial, the Ceram-Back name reportedly was in the process of being trademarked.

Those PPI employees responsible for mixing the Ceram-Back compound had access to the ingredients. A material safety data sheet (MSDS sheet) for Ceram-Back, which identified Ceram-Back's ingredients, was posted on a wall at the manufacturing facility. All employees were free to walk through the coating and mixing area.

Neither Allison nor anyone else from PPI patented the Ceram-Back formula. According to Allison, he did not seek a patent because doing so would publicize the ingredients to Ceram-Back and because a patent would last only for 17 years. To maintain the secrecy of the Ceram-Back formula, PPI refused to furnish its customers an MSDS sheet and PPI prohibited its sales employees from disclosing the ingredients to potential customers. In addition, Pat Damman, the president of PPI, testified that employees were told to hide the containers holding the ingredients under a tarp when outsiders would visit the business. Bunney and Robarts disputed this claim.

In addition to refining PPI's original coating formula, Messenger also created a formula to determine the number of inches on a pipe that one "batch" or unit of Ceram-Back would cover for each size of pipe (*e.g.*, 2-inch pipe, 3-inch pipe, etc.). Based on Messenger's findings, Allison created a computer program that enabled PPI to efficiently determine the number of Ceram-Back batches necessary to complete a job. This calculation was a key component to PPI's pricing method. Only management, PPI's two salespeople, and possibly administrative support had access to the computer pricing program; welders at PPI and coaters who applied the Ceram-Back to the elbows were prohibited from accessing this information.

Although no employee had access to the specific formula and calculations in the computer program, Damman conceded this formula could be ascertained from the written work orders generated by the salespeople. The work orders included the number of batches necessary to complete a job as well as the number of inches that the batches of Ceram-Back would cover. Damman agreed that a person with an adequate background in mathematics could "back out the math" for the formula based on this information. Allison also admitted that a person could determine by hand how much was needed to complete a pipe "[i]f [they] knew enough math."

To measure the Ceram-Back ingredients for mixing, PPI's employees used ordinary plastic cups and a tea pitcher. PPI marked each cup and the pitcher with lines, with each line representing one batch of Ceram-Back. There was no evidence that PPI informed its employees that its method of mixing and applying the Ceram-Back was confidential.

PPI also created price sheets or price lists displaying the prices of various standard elbows. According to Damman, the price sheets were not supposed to be given out to employees who did not have access to them, although he also admitted that he never clearly communicated this to the sales employees. PPI routinely sent these price lists out to prospective customers who requested them.

PPI's customer lists were regarded as confidential information to which only sales employees were permitted access. These lists could be found exclusively on PPI's computer system. However, one time Swartz and another PPI employee printed a customer list to use at a trade show. Swartz testified that he later disposed of the list. According to Robarts, PPI wrote the customer contact information on the work orders, and he was never informed to keep this confidential.

Bunney, Robarts, and Swartz admitted that they knew little or nothing about the business of coating steel elbows for pneumatic conveyance systems before working at PPI. Robarts admitted that his idea to form VIN originated from his employment as a welder at PPI. While the two men were still working at PPI, Robarts began operating VIN with Bunney, who had been trained at PPI to mix the Ceram-Back and coat the elbows.

Except for the brand name of one of the ingredients, VIN's ceramic compound mirrored the Ceram-Back formula. Like PPI, VIN used a tea pitcher and plastic cups marked in segments to mix its compound. Robarts admitted that he obtained batch information from PPI's work orders and used this at VIN. Robarts further admitted that Swartz had given him one of PPI's price sheets, which he used to undercut VIN's pricing.

Despite these telling similarities, there is one slight difference between the two companies. Approximately 85 percent of PPI's business is selling pipe elbows with the coating already applied, while 15 percent of PPI's sales are "application only," where the customer supplies the elbow to be coated. In contrast, VIN does not have an elbow supplier; thus, its business is limited to a coating-only service.

VIN hired Swartz for its sales position. Swartz knew of PPI's customers because he had worked as a sales employee at PPI. Swartz admitted that he and Robarts met with one of PPI's customers and that they had coated two elbows for the customer worth $512.47 before the district court entered its temporary restraining order. According to Robarts, VIN would have secured a deal with the customer worth over $15,000 if not for the restraining order.

After hearing the evidence, the district court ruled from the bench, although a journal entry of the court's ruling was later filed. The district court found that PPI had "a" trade secret that included the Ceram-Back formula, mixing process, the pricing method contained in the computer program, and the price sheet, the last of which was misappropriated by Swartz. The district court also found that VIN was "in possession of this trade secret, or at least very important portions of this trade secret, including the exact formula," and that PPI "was a bit lax in protecting this trade secret."

Finally, while concluding that PPI's trade secret should be protected, the district court also expressed its view that the Kansas Uniform Trade Secrets Act (KUTSA) was not intended to absolutely prevent competition or commerce and that KUTSA did not authorize the court to deny Bunney, Robarts, and Swartz the right to pursue their own business. For these reasons, the district court entered a royalty injunction against VIN, permitting it to continue

its business but ordering it to pay PPI a 20 percent royalty on sales occurring between July 21, 2006, through July 20, 2009. The court also imposed several restrictions on the content of VIN's advertising, as well as other conduct.

PPI appeals, arguing the district court erred in imposing royalty payments instead of a permanent injunction. Appellees cross-appeal, arguing there was insufficient evidence to support the district court's finding that a trade secret had been misappropriated in the first place. Because the district court's decision to grant relief (whether in the form of royalties or permanent injunction) is necessarily based on the court's underlying finding of misappropriation, we will address the issue of misappropriation first.

### *Analysis*

### *I. Did The District Court Err In Finding Misappropriation Of A Trade Secret?*

#### *A. Trade Secret*

The threshold inquiry in an action for misappropriation of a trade secret under KUTSA, K.S.A. 60-3320 *et seq.*, is whether there is a trade secret to be misappropriated in the first instance. *Fireworks Spectacular v. Premier Pyrotechnics*, 147 F. Supp. 2d 1057, 1065 (D. Kan. 2001); see also *Koch Engineering Co. v. Faulconer*, 227 Kan. 813, 826, 610 P.2d 1094 (1980) (noting that threshold issue in common-law action to enjoin unauthorized use of trade secret was whether there was a trade secret to be misappropriated). Whether a trade secret exists is an issue for the trier of fact. *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1151 (D. Kan. 2007).

When a verdict is challenged as being contrary to the evidence, the appellate court does not reweigh the evidence or pass on the credibility of the witnesses. *City of Mission Hills v. Sexton*, 284 Kan. 414, 422, 160 P.3d 812 (2007). The court accepts as true the evidence and all inferences to be drawn therefrom, which support, or tend to support, the verdict or judgment below and disregards any conflicting evidence or other inferences which might be drawn therefrom. *Calver v. Hinson*, 267 Kan. 369, 375, 982 P.2d 970 (1999). If the evidence, when considered in the light most favor-

able to the prevailing party, supports the verdict, the appellate court should not intervene. See *City of Mission Hills*, 284 Kan. at 422.

KUTSA was enacted in 1981 and patterned after the Uniform Trade Secrets Act (UTSA) promulgated by the National Conference of Commissioners on Uniform State Laws. *McCaffree Financial Corp. v. Nunnink*, 18 Kan. App. 2d 40, 48, 847 P.2d 1321 (1993). The general purpose of KUTSA is to make uniform the law of trade secrets among the states enacting provisions modeled after UTSA. See K.S.A. 60-3327 (stating that KUTSA shall be applied and construed to effectuate its general purpose).

KUTSA defines trade secret as follows:

" 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

"(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

"(ii) *is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.*" (Emphasis added.) K.S.A. 60-3320(4).

Here, Appellees do not dispute the district court's finding that the customer lists, price lists, computer program, Ceram-Back formula, and the mixing and application process met the requirements for a "trade secret" under 60-3320(4)(i). Instead, Appellees assert there is insufficient evidence to support a finding that PPI used reasonable measures to maintain the secrecy of the information, which necessarily prohibits the information from qualifying as a trade secret pursuant to K.S.A. 60-3320(4)(ii).

In support of their assertion, Appellees rely on an unpublished case from the United States District Court for the District of Kansas for the proposition that employees have a duty to protect information if, *and only if*, they are informed that the information is confidential. *Webster Engineering and Mfg. Co., Inc. v. Francis*, 1993 WL 406025, at *4 (D. Kan. 1993) (unpublished opinion). Because the evidence demonstrates that PPI never informed its employees that the alleged trade secrets were confidential, Appellees argue that PPI failed—as a matter of law—to make reasonable efforts to maintain secrecy as required by K.S.A. 60-3320(4)(ii).

We are not persuaded by Appellees' argument. As a preliminary matter, we do not read the persuasive authority upon which Appellees rely to stand for the legal proposition cited. To that end, the court's language must be placed in context:

"To qualify as a trade secret, the information need not be kept absolutely secret; it is sufficient that the company make all disclosures confidential. *Dionne v. Southeast Foam Converting & Packaging, Inc.*, 397 S.E.2d 110, 112 (Va. 1990). Although plaintiff correctly notes that joint venturers and employees are expected to protect confidential information, it is necessary to inform employees what information is considered confidential. [*Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 902 (Minn. 1983).]" *Webster Engineering and Mfg. Co.*, 1993 WL 406025, at * 4.

As this language shows, the court in *Webster Engineering* did not hold that employees *must* be informed that information is confidential in order for the information to qualify as a trade secret. Rather, the court merely observed that informing employees that information is confidential is *sufficient* for the information to qualify as a trade secret. This is consistent with uniform authority providing that "reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on 'need to know basis,' and controlling plant access" but that "public disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection." 14 Uniform Laws Annotated, p. 539 (2005).

For the reasons stated above, we hold that the proper approach to determine whether reasonable security measures to protect a trade secret were implemented as required by K.S.A. 60-3320(4)(ii) involves an analysis of all the circumstances. Based on this holding, we now will determine whether there was sufficient evidence to support the district court's finding that PPI used reasonable measures to maintain the secrecy of (1) the Ceram-Back formula; (2) the mixing process; (3) the batch method; (4) the pricing lists; and (5) the customer lists.

### 1. The Ceram-Back Formula

All employees had access to an MSDS sheet, which listed the ingredients to Ceram-Back, and the ingredients could be found in

the mixing area, to which employees' access was not restricted. With that said, Damman testified that he expressly prohibited Swartz, a sales employee, from disclosing the Ceram-Back formula to the public. Damman also testified that the employees were told to cover up the ingredients when outsiders visited the plant. Although Bunney and Robarts later disputed Damman's testimony, we must disregard such conflicting evidence as it does not support the judgment below. See *Calver*, 267 Kan. at 375. For these reasons, we conclude there was sufficient evidence from which the district court could find that PPI engaged in reasonable efforts to maintain the secrecy of the Ceram-Back ingredients.

### 2. The Mixing Process

The only evidence suggesting that PPI attempted to keep the Ceram-Back mixing process a secret consisted of Damman's testimony. Damman testified that the employees did not have access to the amount of ingredients necessary to make a batch of Ceram-Back. Damman admitted, however, that the PPI employees whose duty it was to mix the compound measured the ingredients using a common tea pitcher and plastic cups, both of which were divided into segments representing batches of Ceram-Back. Thus, Damman must have meant that PPI did not provide the employees access to the quantity *in standard units of measurement* of each ingredient necessary to make a batch of Ceram-Back. PPI *did* reveal the quantity of each ingredient necessary to make one batch of Ceram-Back *using its premarked plastic cups and tea pitcher*, and *this* was the data Appellees later used at VIN. PPI points to no proof that it treated this information with any secrecy, and no such evidence could be found in the record. As a result, we find there was insufficient evidence for the district court to conclude that the mixing process qualified as a trade secret. See K.S.A. 60-3320(4)(ii).

### 3. The Batch Method

The foundation of PPI's pricing method was Messenger's discovery that one "batch" of Ceram-Back would cover a certain number of square inches on a pipe. When converted to computer for-

mat, Messenger's calculations enabled PPI to determine in a quick and efficient manner the amount of Ceram-Back necessary to complete a work order. Although PPI permitted management, salespeople, and possibly administrative support to use the computer pricing program, access to the internal formula or formulas derived from Messenger's calculations were limited exclusively to Allison and Damman. As Damman explained, PPI told its employees the amount of batches to apply to an elbow but did not give its employees access to its method for determining *"how* to come up with [the] amount of batches." (Emphasis added.)

Notwithstanding this explanation, Damman admitted on cross-examination that when a pipe was to be coated, PPI sent work orders to its employees which told them the number of batches to prepare *and disclosed the number of inches that the batches would cover on the pipe.* Damman conceded that a person with knowledge of the number of batches necessary to cover a specific area on a pipe could "back out the math . . . [a]s long as you know how to figure your square inches over the back." Similarly, Allison admitted that a person with a sufficient mathematics background could determine how much Ceram-Back was needed to complete a work order without using the pricing program. Thus, PPI's efforts at keeping this information confidential were not seamless.

Nevertheless, KUTSA only requires efforts to maintain secrecy that are reasonable under the circumstances; perfection is not required. See K.S.A. 60-3320(4)(ii); *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003). Moreover, this court will not reweigh conflicting evidence on this issue. See *Calver*, 267 Kan. at 375. Here, there is sufficient evidence to support the district court's decision that PPI's batch method constituted a trade secret.

### 4. Price Lists

PPI created price sheets showing the price for standard coated elbows and coating-only services. PPI intended that only sales employees be permitted access to these lists, and Swartz, a former sales employee, testified that he knew he was not supposed to give a price sheet to Robarts, who operated as a welder at PPI. With

that said, the price sheets were disclosed to any customer who requested them. Thus, as a matter of law, the price sheets did not constitute trade secrets, and the district court erred in holding otherwise. See *Applied Indus. Materials Corp. v. Brantjes*, 891 F. Supp. 432, 438 (N.D. Ill. 1994) (price information which is disclosed by a business to any of its customers does not constitute trade secret information because customers are free to communicate the information to anyone).

### 5. Customer Lists

Finally, Appellees claim there was insufficient evidence to establish PPI's customer list was a trade secret. In its journal entry of judgment, the district court never found that the customer list merited trade secret protection. In listing the information that met the definition of trade secret under K.S.A. 60-3320(4), the district court included several items, including the formula and pricing method used by PPI, but not the list of customers. PPI points to nothing in its brief establishing otherwise. Therefore, we will not address this issue.

Based on the discussion above, there was sufficient evidence to support the district court's determination that PPI used reasonable efforts to maintain the secrecy of the Ceram-Back formula and its batch method. Accordingly, we find without merit Appellees' allegation that there was no underlying trade secret.

### B. Misappropriation

A finding that a trade secret has been misappropriated is a prerequisite to injunctive relief under KUTSA. See K.S.A. 60-3321(a). Whether a trade secret has been misappropriated generally presents a question of fact. *MicroStrategy Incorporated v. Li*, 268 Va. 249, 264, 601 S.E.2d 580 (2004). If the evidence, when considered in the light most favorable to PPI, supports the district court's finding of misappropriation here, we may not disturb the court's decision. See *City of Mission Hills*, 284 Kan. at 422.

Here, Appellees contend that only the price sheet should be subject to an injunction. Appellees' contention is based entirely on the premise that the district court's journal entry only found the

*price sheet* to have been misappropriated. We disagree with Appellees' interpretation of the district court's findings.

Relevant to the evidence presented here, KUTSA defines misappropriation as

"(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

. . . .

"(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

. . . .

"(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." K.S.A. 60-3320(2)(ii)(B)(II).

In paragraph 14 of the journal entry, the district court found that PPI did have "a" trade secret and that it included

"information, a formula, a program, some method or technique of batching, and the quantification of the . . . units and the exact formula as pointed out by plaintiffs with regard to the mixture and the ingredients, the pricing method established by them and contained within their computer program, and the price sheet."

In paragraph 15, the district court made one finding: that Swartz "misappropriated the price sheet." Paragraph 15 constitutes the district court's only express finding on misappropriation. In paragraph 16, however, the district court found that Appellees were in possession "of this trade secret, or at least very important portions of the trade secret, *including the exact formula,* and all this information was gained during the [Appellees'] employment at PPI." (Emphasis added.) The district court later found that PPI's trade secret "should be protected not only by PPI but by [Appellees]." Finally, the district court's injunctive order permitted Appellees to operate their business while directing them to "preserve the trade secret" and "not divulge the formula or method to any other company or parties."

"In reviewing the findings of fact made by the trial court, an appellate court will give them a liberal construction in order to uphold rather than defeat the decision appealed from. Doubtful or ambiguous findings will be construed whenever possible to support the trial court's decision." *Landrum v. Taylor*, 217 Kan. 113, Syl. ¶ 1, 535 P.2d 406 (1975). To that end, we acknowledge that

the journal entry and respective orders in this case may be ambiguous. After making a broad finding in paragraph 14 that the Ceram-Back formula, the batch method, the price sheets, and other information all met the definition of trade secret under KUTSA, the district court made a finding with regard to misappropriation in paragraph 15 that appears to be limited to the price sheet. Notwithstanding this limitation, the remaining paragraphs of the district court's journal entry then go back to reflect the previously referenced broader view of misappropriation. We conclude the finding in paragraph 15 is inconsistent with the rest of the court's findings.

In addition to inconsistency with the rest of the district court's written decision, we also find the restricted finding of misappropriation in paragraph 15 to be inconsistent with the undisputed evidence in the record. In Kansas, uncontradicted evidence that is not improbable or unreasonable ordinarily is deemed conclusive and cannot be disregarded unless it is shown to be untrustworthy. *In re Adoption of W.J.*, 262 Kan. 788, 795, 942 P.2d 37 (1997).

With respect to the batch method, Robarts specifically admitted that he obtained this concept at PPI and used it at VIN. Moreover, there was undisputed evidence that Appellees used their knowledge with respect to the Ceram-Back ingredients. According to Robarts, the formula to make VIN's ceramic compound was "close" to the Ceram-Back formula. This was an understatement. The ingredients to Ceram-Back and Appellees' compound practically were *identical*; the only variation was the brand name of one of the ingredients. This discrepancy is inconsequential. See *Mangren Research & Development v. Nat. Chemical Co.*, 87 F.3d 937, 944 (7th Cir. 1996) (" '[T]he user of another's trade secret is liable even if he [or she] uses it with modifications or improvements upon it effected by his [or her] own efforts, so long as the substance of the process used by the actor is derived from the other's secret.' ").

In sum, it is necessary to construe the district court's legal findings to include a finding of misappropriation for the Ceram-Back ingredients and the batch method in order to give effect to the district court's factual findings. Such a construction harmonizes these findings with the undisputed evidence in the record and the

district court's subsequent order. For these reasons, we reject Appellees' argument that the district court's finding of misappropriation was limited to the price sheets.

### II. Did The District Court Err In Its Choice Of Remedy For The Misappropriation?

In its journal entry, the district court modified the preliminary restraining order and injunction to permit VIN to continue manufacturing and selling ceramic coating for pipe elbows as long as VIN refrained from divulging, selling, or advertising any part of PPI's trade secrets for a period of 3 years. The court further ordered VIN to pay to PPI a 20 percent royalty on all sales for the next 3 years. On appeal, PPI asserts there was insufficient evidence to support the existence of exceptional circumstances, which was a prerequisite to ordering a royalty injunction under K.S.A. 60-3321(b).

As a preliminary matter, we note PPI never objected to this omission during or after the district court proceeding. Generally, a litigant must object to inadequate findings of fact and conclusions of law in order to allow the trial court an opportunity to correct them, and in the absence of an objection, omissions in findings will not be considered on appeal. Where no objection is made, the appellate court will presume the trial court found all facts necessary to support its judgment. With that said, we may still consider a remand if the lack of specific findings precludes meaningful review. *Dragon v. Vanguard Industries*, 282 Kan. 349, 356, 144 P.3d 1279 (2006). In this case, we find it necessary to consider the issue presented.

Kansas courts review a district court's decision regarding an injunction under an abuse of discretion standard. *Board of Leavenworth County Comm'rs v. Whitson*, 281 Kan. 678, 683, 132 P.3d 920 (2006). Judicial discretion is abused only when no reasonable person would take the view of the district court, and the party who asserts abuse of discretion bears the burden of showing it. The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions. *State v. Stevens*, 285 Kan. 307, 323, 172 P.3d 570 (2007).

A district court's authority to order that a royalty be paid stems from one of two sources in KUTSA. First, the district may order a royalty as damages. See K.S.A. 60-3322 (stating that measure of damages may be measured by imposition of liability for reasonable royalty). In the journal entry, however, the district court specifically denied PPI's claim for damages; thus, it is clear that the district court did not rely on this provision in imposing the royalty.

Instead, it appears the district court utilized K.S.A. 60-3321, which permits the court to enter an injunction that conditions future use upon payment of a royalty (royalty injunction):

"(a) Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

"(b) *In exceptional circumstances, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time for which use could have been prohibited. Exceptional circumstances include, but are not limited to, a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation that renders a prohibitive injunction inequitable.*" (Emphasis added.)

As noted above, KUTSA was patterned after the Uniform Trade Secrets Act. *McCaffree Financial Corp. v. Nunnink*, 18 Kan. App. 2d at 48. The comment to § 2(b) of UTSA specifically notes that, as used in this particular section, a royalty award is not to be used by the courts as a measure of damages for past conduct. Instead, application of § 2(b) is an injunction that conditions a misappropriator's future ability to use a trade secret upon payment of a reasonable royalty. 14 Uniform Laws Annotated, comment, pp. 620-21. This is consistent with the definition in Black's Law Dictionary that describes a reasonable royalty as the amount "a licensee would be willing to pay the holder of the thing's intellectual-property rights while still making a reasonable profit from its use." Black's Law Dictionary 1356 (8th ed. 2004).

The comments to UTSA further elaborate on when an injunction conditioning use on the periodic payment of a reasonable royalty is appropriate:

"Section 2(b) deals with the special situation in which future use by a misappropriator will damage a trade secret owner but an injunction against future use nevertheless is inappropriate due to exceptional circumstances. Exceptional circumstances include the existence of an overriding public interest which requires the denial of a prohibitory injunction against future damaging use and a person's reasonable reliance upon acquisition of a misappropriated trade secret in good faith and without reason to know of its prior misappropriation that would be prejudiced by a prohibitory injunction against future damaging use." 14 Uniform Laws Annotated, comment, p. 620.

Put in simpler terms, this comment provides for exceptional circumstances when (1) there is an overriding public interest or (2) the trade secret at issue was acquired in good faith and the resulting prejudice to the innocent misappropriator in restraining future use outweighs the interests of the aggrieved owner of the trade secret.

With regard to overriding public interest, the first exceptional circumstance identified, the UTSA comment specifically cites to the case of *Republic Aviation Corp. v. Schenk*, 152 U.S.P.Q. 830 (N.Y. Sup. Ct. 1967), as an illustration of justification for withholding injunctive relief. In *Schenk*, the court determined that enjoining a misappropriator from supplying the United States with an aircraft weapons control system would have endangered military personnel in Viet Nam. Thus, in order to qualify as an overriding public interest, the comment appears to suggest a dual inquiry: first, identification of an overriding interest and, second, a substantial probability that the public will be prejudiced if the misappropriator is enjoined from use.

With regard to innocents who acquire misappropriated trade secrets in good faith, the second exceptional circumstance identified, the UTSA comment explains that a court, "[i]n weighing an aggrieved person's interests and the interests of a third party who has relied in good faith upon his or her ability to utilize information, . . . may conclude that restraining future use of the information by the third party is unwarranted." 14 Uniform Laws Annotated, comment, p. 620.

Here, the district court observed that KUTSA was not intended to absolutely prevent business competition and found that denying Appellees the right to pursue their business would be outside the scope of authority granted by KUTSA. The district court also noted

that PPI "was a bit lax" in protecting its trade secret. With that said, the court also noted that PPI had a trade secret which must be protected by PPI and Appellees. Although the district court did not expressly utilize the phrase "exceptional circumstances," we conclude from the court's findings that its decision was based on a balancing of the following factors relevant to the determination of exceptional circumstances: the interest in competition, PPI's culpability in failing to protect its interests, and the need for some trade secret protection. We find these factors insufficient as a matter of law to establish exceptional circumstances as that term is used in K.S.A. 60-3321(b).

As a preliminary matter, we do not consider society's general interest in fostering competition to rise to the level of an overriding public interest requiring the court to withhold injunctive relief. Although we acknowledge society's general interest in fostering competition is a matter of public concern, there simply is no evidence to establish a substantial probability that the public will be prejudiced if the misappropriators here are enjoined from manufacturing and selling the ceramic coating. This is not a case where Appellees made improvements, or any change at all, to the misappropriated product. Neither is this a case where the public will be prohibited from accessing the product if Appellees are enjoined from manufacturing and selling it. We find no evidence that enjoining Appellees from manufacturing and selling the ceramic coating was detrimental to public interests.

Moreover, and unlike the situation contemplated by K.S.A. 60-3321(b), the Appellees here did not innocently acquire the trade secrets from some third party and then misappropriate them in good faith. In its findings of fact, the district court found that Robarts, Bunney, and Swartz obtained the formula, mixing process, pricing method, and price sheet directly through their employment at PPI and, at least with regard to some of this information, knew "it was either a trade secret or something that wasn't to be divulged or something that shouldn't have been relayed to third parties or other businesses or even themselves, if they chose to leave employment and start a new business, which is what they did." The district court further found that Swartz obtained

"the price sheet for Defendant Robarts at Robarts' request prior to leaving the company and in anticipation and with knowledge that he was going to start his own business known as VIN in direct competition with his employer PPI and in anticipation of contracting [sic] known customers of PPI through Swartz's knowledge and contacts and that he gained also working at PPI."

In sum, we find (1) no evidence of an overriding interest that would prejudice the public if the misappropriators were enjoined; (2) no evidence that the trade secret at issue was acquired in good faith; and (3) no evidence of any other exceptional circumstance as required by K.S.A. 60-3321 to support the district court's decision to issue a royalty injunction conditioning future use upon payment of a royalty. Without such evidence, we conclude no reasonable person would have issued a royalty injunction; thus, the district court's decision to do so was an abuse of discretion.

Because there was no evidence to support the district court's decision to issue a royalty injunction, the appropriate disposition here is a remand for the district court to determine whether an alternative order of injunction prohibiting use is necessary to "eliminate [any] commercial advantage that otherwise [was] derived from the misappropriation." K.S.A. 60-3321(a). In making this determination on remand, the district court should consider to what extent Appellees' improper use of PPI's trade secret information allowed Appellees to truncate the time that otherwise would have been required, through experimentation and adjustment, to arrive at a process that yielded a product they could take to the marketplace. This consideration is consistent with the purpose of an injunction in the first place: to strip misappropriators of the advantage they improperly obtained and require them to develop their own manufacturing process without using trade secrets.

With regard to the appropriate duration of such an injunction, the comment to § 2 of UTSA states the rule as follows:

"Subject to any additional period of restraint necessary to negate lead time, an injunction accordingly should terminate when a former trade secret becomes either generally known to good faith competitors or generally knowable to them because of the lawful availability of products that can be reverse engineered to reveal a trade secret." 14 Uniform Laws Annotated, comment, p. 620.

Thus, injunctive relief ordinarily should continue only until the defendant could have acquired the information by proper means. Injunctions extending beyond this period are justified only when necessary to deprive the defendant of a head start or other unjust advantage that is attributable to the misappropriation. See 14 Uniform Laws Annotated, p. 619. More extensive injunctive relief undermines the public interest by unduly restraining legitimate competition.

Reversed and remanded for further proceedings consistent with this opinion.